**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | | |
|---|---|---|
| CONNOR O'KEEFE, on behalf of himself and all others similarly situated, | ) ) ) | Case Number 1:23-cv-20700 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CLASS ACTION** |
| SEQUOIA CAPITAL OPERATIONS, LLC, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**CLASS ACTION COMPLAINT**

**INTRODUCTION**

1.      On November 11, 2022, the world learned what Defendants had long known. Sam Bankman-Fried ("SBF") was a fraud.



2.      Through his cryptocurrency exchange, FTX, SBF preyed on naïve, young investors, persuading them to deposit hard-earned monies into accounts on the exchange, promising them the funds would be safe and garner returns other financial institutions could not provide.

3.      Both were lies. SBF was in fact running a Ponzi scheme, whereby he took in FTX customer funds, transferred those funds to entities he separately owned, and then spent the money on things of unmatched luxury, including a Formula One team, beachfront property in The Bahamas, expensive cars, and private jets. SBF swindled more than $8 billion from FTX customers in this way.

4.     Though FTX customers could not see that SBF was misappropriating their deposits on vice, vanity, and speculative personal investments, Defendants had full view. Through diligence on FTX and close ties with SBF, Defendants learned that FTX was operated as SBF's personal piggy bank, that as quickly as FTX customer funds flowed into FTX, they flowed back out to other entities SBF separately owned or controlled, and that FTX lacked the most basic internal controls, such that the enterprise was in fact a house of cards. But Defendants did not care. They, too, had money to make in the scheme, and their interests aligned with SBF's.

5.     SBF's fraud relied on two objectives: first, to keep FTX customer funds flowing into accounts on the exchange; second, to keep the fraud concealed from the public eye. Defendants shared these objectives, as each Defendant benefited from the steady, and increasing, flow of customer funds into FTX accounts. Various banks ("Defendant Banks"), where FTX held multiple accounts, benefited billion-dollar increases in their low-cost deposit bases derived from FTX customer funds. Defendant venture capitalists ("Defendant VCs"), who invested more than $2 billion in FTX, benefited from the astronomical valuation that increasing deposits generated for FTX, upon which the value of Defendant VCs' stakes in the company astronomically grew. Defendant Fenwick & West and Defendant accounting firms ("Defendant Accounting Firms"), meanwhile, benefited from the premium fees they could continue to extract for services to FTX, paid for with FTX customer proceeds.

6.     With shared objectives and complementary motives, Defendants conspired with FTX to perpetuate the fraud, and each committed critical overt acts in furtherance of it:

- Defendant Banks provided a suite of non-routine, high risk banking services to FTX, when traditional financial institutions would not, including accepting and/or transferring Class Members (defined herein) funds into accounts that Defendant Banks knew were held by entities that SBF separately owned; developing proprietary blockchain software and other infrastructure necessary to SBF's looting

of Class Members funds; and helping to fence Class Member funds across the U.S. border.

- Defendant VCs wielded their power, influence, and deep pockets to launch FTX's house of cards to its multi-billion dollar scale. Defendant VCs invested nearly $2 billion in FTX, and SBF returned the favor in kind, investing millions of dollars in Defendant VCs. This was more than a simple *quid pro quo*, and Defendant VCs were more than passive investors. Indeed, Defendant VCs provided critical groundwork for the FTX fraud, including serving on FTX's advisory board and providing other support, and promoting FTX despite knowing that SBF was misappropriating Class Member funds, by making public statements valorizing FTX and publishing glowing profiles of SBF, proclaiming, for example, that "the FTX competitive advantage" is SBF's "[e]thical behavior" and Class Members should "trust [their] money with SBF, hands-down."

- Defendant Fenwick & West set up a network of shadowy front organizations, which SBF used to conceal his siphoning of Class Member funds into entities that he separately owned. Fenwick & West also guided FTX's skirting of regulatory oversight, structuring acquisitions to obtain necessary licenses while circumventing regulatory scrutiny, advising on FTX's regulatory dodge, more generally, and supplying personnel to execute on that strategy directly from its own pool of lawyers.

- Defendant Accounting Firms performed sham audits of FTX's primary entities, certifying that FTX's financials were sound and sufficient controls in place, despite knowing full well that neither was true. These audits lent to FTX a necessary veneer of legitimacy and security, which in turn helped to conceal the fraud, and SBF leveraged these endorsements in hawking FTX to the public.

7.     SBF could not have perpetuated the fraud without this assistance from Defendants. Plaintiff O'Keefe, on behalf of himself and all others similarly situated ("Class Members"), seeks damages for Defendants' knowing and substantial assistance in furtherance of SBF's fraud.

## **JURISDICTION AND VENUE**

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00 and diversity of citizenship exists between at least one Class Member and at least one of the Defendants.

9.     This Court has personal jurisdiction over Defendants because the Court has

jurisdiction over one or more of the co-conspirators of the civil conspiracy alleged herein, and because Defendants regularly conducted business in Florida and/or engaged in continuous and systematic activities within Florida, and committed tortious acts in the state of Florida, including aiding and abetting the fraud, and the other tortious acts, as alleged herein.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District.

## PARTIES

11.     Plaintiff Connor O'Keefe ("Plaintiff O'Keefe") is a resident of the State of Mississippi. Plaintiff O'Keefe held funds in both U.S. dollars and cryptocurrencies in a yield-bearing account ("YBA," further defined herein) and/or other account on the FTX platform. On November 18, 2021, Plaintiff O'Keefe deposited these funds by direct transfer of US dollars from his bank account to an account he understood to be held by FTX. As further detailed herein, FTX promised that his assets would be secure and would return yields of 5% to 8%. Later, Plaintiff O'Keefe transferred cryptocurrencies into his FTX account from an account he held at Coinbase Global, another cryptocurrency exchange. Plaintiff O'Keefe believed that he had made safe investments. To be sure, he regularly monitored his investments, as well as the media surrounding FTX. Because of the overt acts taken by Defendants and described herein, Plaintiff O'Keefe was misled to believe that the assets placed in his FTX account were safe, that FTX was a legitimate operation, and that its founder, SBF, was a trustworthy entrepreneur. Plaintiff O'Keefe never fully liquidated the funds in his FTX account. Plaintiff O'Keefe's funds are now frozen in his FTX account, and he has been unable to withdraw those funds since the FTX fraud collapsed.

12.     Defendant Silvergate Bank ("Silvergate") is a state-chartered bank and member of

the Federal Reserve based in La Jolla, California. According to its website, Silvergate is the leading provider of innovative financial infrastructure solutions and services for the growing digital currency industry.

13.     Defendant Signature Bank ("Signature") is a state-chartered bank and member of the Federal Reserve based in New York, New York. Signature is a full-service commercial bank that caters specifically to crypto companies and is a self-proclaimed "leader in the digital banking arena."

14.     Defendant Deltec Bank and Trust Company Limited ("Deltec") is an offshore bank licensed and operating in The Bahamas. Deltec is one of the few banks in the world that offers a full suite of digital asset services, including multi-currency banking, digital asset custody, trading, market making, lending and borrowing.

15.     Defendant Farmington State Bank d/b/a Moonstone Bank ("Moonstone") is a state-chartered bank and member of the Federal Reserve based in Farmington, Washington. Moonstone "serve[s] new customers in underserved industries, such as digital assets and hemp/cannabis businesses."

16.     Defendant Jean Chalopin is a banking executive domiciled in The Bahamas. During the relevant period, Mr. Chalopin served, and continues to serve, as the chairman of Defendant Deltec and the chairman and chief executive officer of Defendant Moonstone.

17.     Defendant Sequoia Capital Operations, LLC ("Sequoia") is a venture capital firm based in Menlo Park, California, with approximately $85 billion in assets under management.

18.     Defendant Thoma Bravo L.P. ("Thoma Bravo") is a software-focused private investment firm with over $120 billion in assets under management. Thoma Bravo is headquartered in Chicago, Illinois and San Francisco, California.

19.     Defendant Paradigm Operations LP ("Paradigm") is a crypto and Web3-focused venture capital firm based in San Francisco, California. As of April 2022, Paradigm's assets under management totaled approximately $13.2 billion.

20.     Defendant Temasek Holdings (Private) Limited ("Temasek") is a global commercial investment company owned by the Government of Singapore, with a portfolio valued at more than $400 billion.

21.     Defendant Softbank Vision Fund (AIV M2) L.P. ("SoftBank Fund") is a venture capital fund formed as a Delaware limited partnership by Defendant Softbank Group Corp. ("Softbank Group" and, together with Softbank, "Softbank Defendants"), a Japanese holding company. Softbank Group invested in FTX through Softbank Fund, and engaged in the misconduct referenced herein in order to increase the value of those investments. SoftBank Fund is one of the largest technology funds in the world, totaling approximately $56 billion. SoftBank Defendants' main U.S. office is in Silicon Valley, California.

22.     Defendant Ribbit Capital, L.P. ("Ribbit Capital") is a venture capital firm "[f]ocused on the intersection of financial services and technology," based in Palo Alto, California. As of September 2020, Ribbit Capital reported that it managed more than $2.6 billion of investor capital.

23.     Defendant Altimeter Capital Management, LP ("Altimeter") is a technology-focused investment firm based in Menlo Park, California and Boston, Massachusetts. Altimeter is an SEC-registered investment advisor and holds approximately $18 billion in assets under management.

24.     Defendant Multicoin Capital Management LLC ("Multicoin") is a "thesis-driven" investment firm specializing in cryptocurrencies, with $600 million in assets under management.

Multicoin is based in Austin, Texas.

25.     Defendant Tiger Global Management, LLC ("Tiger Global") is "an investment firm focused on public and private companies focused on the global Internet, software, consumer, and financial technology industries." Tiger Global is based in New York, New York, and holds approximately $125 billion in assets under management.

26.     Defendant Sino Global Capital Limited ("Sino Global") is a venture capital firm based in The Bahamas with hundreds of millions in assets under management.

27.     Defendant Fenwick & West LLP ("Fenwick & West") is a law firm of nearly 430 attorneys headquartered in Mountain View, California. The firm's practice focuses on technology companies, life sciences companies and start-ups. The firm generates more than $700 million in revenue each year.

28.     Defendant Prager Metis CPAs, LLC ("Prager Metis") is the 45th largest accounting firm by revenue. Prager Metis is headquartered in New York, New York and purports to be the first accounting firm to open in Facebook's "Metaverse."

29.     Defendant Armanino, LLP ("Armanino") claims to be one of the top 25 accounting firms in the United States. Armanino is headquartered in San Ramon, California.

## FACTUAL ALLEGATIONS

### A.  The Rise of FTX

30.     In May 2019, SBF and his co-founders, Gary Wang and Nishad Singh, launched FTX Trading Ltd. ("FTX Trading") and West Realm Shires Services Inc. d/b/a FTX US ("FTX US"), which, along with various subsidiaries, affiliates and related entities (collectively, "FTX"), operated the FTX platform, which FTX purported to be a centralized digital asset exchange aimed

at "the mass market and first-time users" of cryptocurrencies.

31.     FTX based its domestic operations in Miami, Florida, where FTX US was headquartered and where, in early 2021, FTX purchased the naming rights to the Miami Heat's waterfront arena for more than $135 million, one of many sports venues on which FTX paid to have its name emblazoned and one of many extravagant purchases made with Class Members' funds.

32.     Beginning no later than early 2019, for FTX Trading, and no later than May 22, 2020, for FTX US, Class Members could open "yield-bearing accounts" ("YBAs") and/or other accounts, and deposit a wide assortment of cryptocurrencies, as well fiat currency, including U.S. dollars, into the accounts ("Class Member funds") through the FTX website or through FTX's mobile app.

33.     FTX lured Class Members to make such deposits with promises of 8% annual percent yield on assets equivalent up to  $10,000 USD and 5% annual percent yield on amounts between $10,000 USD and $100,000 USD, each of which compounded hourly upon a Class Member's deposit of funds. At no time did FTX register the YBAs pursuant to any federal or state securities law.

34.     By structuring the rates of returns in this way, FTX targeted nascent investors— *i.e.*, those under the age of 30 and/or new to trading, both inexperienced and unsophisticated—by tying higher rates of return to lower deposit amounts with "no fees and no minimum balances."

35.     Unlike a traditional brokerage, FTX took custody of Class Members' assets, which FTX promised to safeguard. In its terms of service, FTX represented to Class Members that "[a]ll cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit;" that "[t]itle to cryptocurrency represented in your FTX.US Account

shall at all times remain with you and shall not transfer to FTX.US.;" and that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US." FTX Trading's terms of service similarly represented that no customer funds were "the property of, or shall be loaned to, FTX Trading," and that FTX Trading "does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading."

36.     FTX assured Class Members that their assets were safe and could be withdrawn at any time, claiming on its website that "FTX *does* back the principal generating the yield with its own funds and equity." SBF further promised, on Twitter in August 2021, "[FTX] will always allow withdrawals (except in cases of suspected money laundering/theft/etc.)."

37.     FTX also promised to protect against the risk that any customer would engage in self-dealing on the exchange or otherwise try to manipulate the market. For example, FTX claimed to offer "wash trading protection," representing that it implemented "exchange controls that actively prevent a party trading with themselves." Additionally, FTX represented, in its terms of service, that "FTX.US does not permit self trades in order to manipulate markets, reported statistics, or cause liquidations."

38.     FTX also purported to protect against the risk that any customer would become overleveraged or undercollateralized on the platform. For this, FTX touted its "risk-engine," an automated monitoring system that required FTX customers to pledge additional collateral to their accounts as trades went bad and, if the customer failed to do so, liquidated that customer's assets. FTX detailed its auto-liquidating "risk engine" and other purported risk management procedures in a public proposal to the U.S. Commodity Futures Trading Commission ("CFTC"), in which FTX sought permission to trade non-intermediated margin products (*i.e.*, without any intermediary to hold customer funds):

A participant's margin level is recalculated every 30 seconds as positions are marked to market, and if the collateral on deposit falls below maintenance margin level, FTX's automated system will begin to liquidate the portfolio. The automated system will liquidate 10 percent of a portfolio at a time by placing offsetting orders on the central limit order book. Once the liquidation process results in collateral on deposit that exceeds the margin requirement, the liquidation will stop. Because the liquidation is done automatically and positions are marked to market every 30 seconds, these liquidations can occur at any time, on a "24-7" basis.

39.     FTX claimed that this and other risk management procedures distinguished it from other cryptocurrency exchanges and ensured that Class Member funds were protected from losses by other users. For example, on May 11, 2022, SBF tweeted that "the margin mode is safe and conservative: real time risk engines mean you neither have to preemptively liquidate days early, nor risk positions going underwater for days." The next day, SBF testified before the U.S. House of Representatives Committee on Agriculture that:

> In our risk model the collateral is held directly at the clearinghouses, the collateral for all the positions. There is CFTC oversight of that collateral, and it is guaranteed to be there to not be used for anything else, to be **segregated**, and that is a difference with traditional models. It provides an extra guarantee of the assets backing these positions. (emphasis added).

At that hearing, in response to Chairwoman Jahana Hayes' concern that FTX's risk monitoring system "could create an opening for fraud and abuse, particularly towards new customers that are entering the digital asset market for the first time," SBF assured that in FTX's model, "there is a lot of capital which is held directly with CFTC oversight [and] **segregated** accounts for margin for the customers' positions, which also provides a capital backstop . . . ." (emphasis added).

40.     More generally, in television commercials, through interviews, on Twitter, and in other publications, FTX repeatedly peddled itself as "the safest and easiest way to buy and sell crypto," and SBF repeatedly promised that "our users' funds and safety come first." In highlighting FTX's purported safety, SBF and other FTX executives falsely represented that FTX was insured by the Federal Deposit Insurance Corporation ("FDIC")—including in a tweet by FTX US

10

President Brett Harrison that "direct deposits from employers to FTX US are stored in individually FDIC-insured bank accounts in the users' names," and "stocks are held in FDIC-insured . . . accounts"—until the FDIC ordered that FTX cease and desist in a letter dated August 18, 2022.

41.     SBF's carefully curated public persona complemented FTX's veneer of safety and was critical to FTX's meteoric rise. SBF came to be "the best-known proponent of the 'effective altruism' social movement which believes in prioritizing donations to projects that will have the largest impact on the most people." In touting his commitment to the movement, SBF explained on YouTube and to journalists that "I wanted to get rich, not because I like money but because I wanted to give that money to charity," and that "I pretty quickly run out of really effective ways to make yourself happier by spending money . . . . I don't want a yacht."

42.     But in truth, SBF *did* want a yacht, and he wanted Formula One teams, BMWs, beachfront condos, and cocaine-fueled parties. And he got those things—with Class Member funds. SBF's association with altruism and charity, and his public denouncements of greed and excess, generated a false trustworthiness among the public and provided necessary goodwill for FTX, each critical to hide his lavish spending of Class Member funds. Defendants dutifully piled on in laundering SBF's reputation to conceal the fraud.

43.     On the basis of these reassurances, along with other representations described herein, FTX grew to become one of the largest cryptocurrency exchanges in the world—at its peak, the exchange's trading volumes reached approximately $21 billion *per day* and its valuation topped $32 billion within three years of its founding.

44.     Defendants knew that FTX's public representations were false, including by way of the omissions set forth in Paragraphs 58 below, and that FTX made a number of material omissions in soliciting Class Members' deposits, further detailed below. But Defendants remained

silent and, worse, fueled SBF's fraud.

**B. The Mechanics of SBF's Fraudulent Scheme**

45.     The FTX fraud was straightforward and, though concealed from Class Members, the fraud was readily apparent to those, like Defendants, with visibility into FTX's operations.

46.     With the promise of higher-than-average returns and leading-edge safeguards, and by way of FTX's material omissions further detailed herein, FTX lured Class Members to deposit U.S. dollars and crypto-based assets into YBAs on the FTX exchange.

47.     Contrary to FTX's representations to its customers that "FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US," and unlike many of its competitors, including Coinbase Global, the largest U.S.-based exchange, FTX did not segregate customer funds or designate them for the customer's benefit, instead commingling those funds in several "omnibus" accounts held by FTX, including accounts at Defendant Banks, the few banks willing to service FTX.

48.     From those omnibus account, at SBF's direction, Defendant Banks transferred Class Member funds to and among his separately owned entities, through which SBF enriched himself, his friends, and his family members, with uncapped spending on illicit drugs, political donations, naming rights to sports arenas, concert sponsorships, luxury cars, private jets, and real estate across the globe.

49.     Frequently, SBF routed his fraudulent scheme through Alameda Research LLC ("Alameda"), a cryptocurrency hedge fund that he independently owned. SBF and Mr. Wang formed Alameda two years before launching FTX and split ownership of Alameda 90% and 10%, respectively. SBF led Alameda as CEO until October 2021, from which time he continued to control the company and maintained ultimate authority over its trading, borrowing/lending, and

investment activity.

50.     Until his scheme collapsed, SBF, along with a number of his lieutenants, publicly maintained that Alameda and FTX were "wholly separate entitit[ies] . . . at arm's length," and, despite their overlapping ownership by SBF, the companies were kept "separate in terms of day-to-day operations" by way of "a Chinese wall . . . to ensure that [Alameda wouldn't get] any sort of special treatment from FTX."

51.     Contrary to these representations, SBF operated FTX and Alameda as a common enterprise. The two companies shared offices for some time, as well as key personnel and other resources critical to the companies' operations.

52.     SBF routinely funneled Class Member funds through Alameda and/or other entities that SBF separately owned using Defendant Banks, sometimes as bogus "related party transactions." For example, financial statements for FTX Trading, now available to the public for the first time, disclose "a related party receivable" valued at $1.2 billion (equivalent to 44% of the company's assets); a $362 million "related party payable"; $250 million in payments (equivalent to 25% of the company's revenues) to a related party for "software royalties;" and a series of related party transactions described only as "currency management" activities. The same financial statements identify that these transactions were for the benefit of SBF, noting that the "primary shareholder [*i.e.*, SBF] is also the primary shareholder of several related entities which do business with the company." Other times, SBF misappropriated Class Member funds as "loans, including for example, a $1 billion 'loan' to himself; a $543 million 'loan' to Mr. Singh; and a $55 million 'loan' to Ryan Salame, another FTX executive."

53.     More often, SBF looted Class Member funds directly, without the cover of sham related party transactions or insider loans. For many years, SBF directed that FTX customer funds

13

be wired to bank accounts at Defendant Silvergate held by North Dimension, a wholly owned subsidiary of Alameda. North Dimension was a fake electronics retailer created by SBF to disguise its ties to FTX. North Dimension shared an address with FTX US in Berkeley, California, and published a website through which customers often "had trouble actually purchasing products" and was "rife with misspellings and bizarre product prices," including "sale prices that were hundreds of dollars above a regular price." For example, North Dimension advertised a $410.00 "Ipad 11 'ich Cell Phone" for the sale price of $899.00:



Once wired to North Dimension's accounts, Class Member funds were commingled with Alameda's and misappropriated by SBF. SBF has admitted to looting Class Member funds in this way, explaining to reporters after the fraud was revealed that "people wired $8b to Alameda and . . . it was never delivered to FTX."

54.     SBF found diverse ends for which to misappropriate Class Members funds, including to pay for Alameda's leveraged trades and investments, which had grown riskier over time. Initially, Alameda primarily traded in high-risk arbitrage, purchasing cryptocurrencies on one exchange and quickly selling them on other exchanges for higher prices. Later, Alameda pivoted to "yield farming," investing in cryptocurrencies that paid interest-like returns. Alameda's entrée into yield farming was not without internal controversy—in early 2021, Caroline Ellison, Alameda's CEO, expressed concerns about the riskiness of Alameda's yield farming investment

14

strategy to no avail. Ms. Ellison was correct to observe that Alameda's bets had grown dodgier. At the time, Sam Trabucco, another Alameda executive, tweeted that Alameda's investing strategies increasingly relied on "intuition" and other unconventional measures, including "Elon Musk's social media posts." Ms. Ellison has since pleaded guilty to misappropriating FTX customer assets to fund Alameda's risky bets and to cover Alameda's colossal losses.

55.     SBF used Class Member funds to underwrite Alameda's risky operations in other ways. Though SBF publicly claimed that Alameda was a "regular user" of FTX, contrary to that representation, FTX exempted Alameda from the automated "risk engine" described in Paragraph 38, allowing Alameda to avoid liquidation under the monitoring system. Compounding FTX's— and, though they did not know it, Class Members'—exposure to Alameda, SBF allowed Alameda to maintain a negative balance in its FTX accounts and steadily increased Alameda's negative balance cap over time. With these exemptions—exemptions offered to no other customers on the exchange—FTX extended Alameda a *de facto* limitless line of credit, which Alameda used to invest $8 billion in risky startups and esoteric cryptocurrencies—highly illiquid investments purchased on credit from FTX, funded with Class Member assets.

56.     SBF also misappropriated Class Member funds to inflate the balance sheets of Alameda, which were largely backed by FTT, a cryptocurrency that FTX contrived from thin air and issued to Alameda at no cost. FTX represented that, as "the backbone of the FTX ecosystem," FTT was widely distributed, but contrary to that representation, most FTT tokens issued were held by FTX and/or Alameda. As of June 30, 2022, Alameda's largest assets were tied to FTT, including "unlocked FTT" totaling $3.66 billion, and "FTT collateral" totaling $2.16 billion. Using Class Member funds and to the benefit of Alameda, SBF manipulated the value of FTT by implementing a "rolling program of buying back and burning [FTT] tokens," a process which consumed a third

of FTX's revenue. By artificially increasing the value of FTT in this way, SBF increased the value of collateral available to Alameda, with which SBF was able to borrow billions of dollars from third party lenders in furtherance of his fraudulent scheme.

57.     Upon information and belief, SBF also employed Alameda to funnel Class Member funds from FTX US to his other companies. Just days before FTX filed for bankruptcy protection, Alameda withdrew over $200 million from FTX US; Alameda then transferred $142.4 million of those funds to FTX Trading's international accounts, exhibiting, according to industry experts, that Alameda had been serving as a "bridge between FTX US and FTX [Trading]" for some time.

58.     At no time did FTX, or any of the Defendants, disclose the foregoing to Class Members, including that:

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

16

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

FTX and Defendants had a common interest in concealing these facts. Had Class Members known of these material omissions, they would not have deposited funds into accounts on the FTX exchange, SBF's fraud would not have succeeded, and neither SBF nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants therefore worked to conceal the fraud, all the while inciting it with critical infrastructure, unique services, and dressings of legitimacy and security. For some time, Defendants succeeded. But, in late 2022, the fraud finally collapsed, and Defendants' misconduct was finally revealed.

**C.  The Fraud's Collapse**

59.     Beginning in mid-2022, the value of cryptocurrencies rapidly declined, and SBF began to bail out troubled crypto firms that, if they were to fail, would bring down FTX with them and reveal SBF's fraud. For example, in the summer of 2022, FTX extended a $400 million revolving credit facility to BlockFi, a crypto lender. At the time, BlockFi held as collateral for loans hundreds of millions of dollars in FTT, the cryptocurrency that FTX had engineered to prop up Alameda. If BlockFi failed, the liquidation of those tokens would crash FTT, and in turn, Alameda, whose assets were primarily backed by the token. FTX's $400 million loan kept BlockFi afloat, and FTX engaged in a number of similar transactions, propping up failing crypto companies in order to keep the fraud alive, as 2022 progressed.

60.     Despite SBF's attempts to keep troubled crypto firms afloat, the value of digital currencies continued to decline throughout 2022, and FTX's liquidity crunch tightened. By the end of summer 2022, SBF needed another $1 billion to keep his fraudulent scheme running. He looked

to Silicon Valley and to sovereign wealth funds in the Middle East, but he was unable to successfully solicit any further investments in FTX. Without this influx of capital, FTX's exposure to margin calls heightened and, in November 2022, SBF's house of cards finally collapsed.

61.     On November 2, 2022, news broke that Alameda's balance sheet was propped up by the FTX-manipulated FTT, revealing the close ties between FTX and Alameda to the public for the first time. FTX had lent billions, including most of its FTT reserves, to Alameda, first as capital for trading, and eventually to cover Alameda's massive losses.

62.     Days later, on November 6, 2022, Changpeng Zhao, CEO of Binance, the world's largest cryptocurrency exchange and FTX's most powerful competitor, tweeted that he intended to sell Binance's $580 million holding of FTT, which threatened to crash the price of FTX's token and, in turn, Alameda's balance sheet. Mr. Zhao's announcement triggered demand for $5 billion in customer withdrawals, which FTX promptly halted due to a lack of funds.

63.     Two days later, Binance offered to rescue FTX from flatlining. On November 8, 2022, Binance announced a non-binding deal to acquire the company. But, after a 24-hour diligence period, Binance backed out of the deal, denying a critical capital injection to SBF. Mr. Zhao explained his reasons for the about-face: "Sam, I'm sorry. We won't be able to continue this deal. Way too many issues. CZ." In truth, there were always too many issues—issues with the interconnectedness between Alameda and FTX, issues with FTX's total lack of internal controls, issues with SBF's looting of Class Member funds—issues of which Defendants were aware, but helped conceal in furtherance of the fraud.

64.     Facing an insurmountable liquidity crisis, on November 11, 2022, FTX filed for Chapter 11 bankruptcy protection, and SBF resigned. The bankruptcy court appointed John J. Ray III, a 40-year industry veteran who oversaw the liquidation of Enron, to replace SBF as CEO. Mr.

Ray quickly uncovered fundamental deficiencies in basic accounting, corporate governance, and other controls by FTX. These deficiencies were so startling that Mr. Ray remarked he had never "seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." Moreover, Mr. Ray uncovered that:

> *First*, customer assets from FTX.com were commingled with assets from the Alameda trading platform.

> *Second*, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.

> *Third*, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.

> *Fourth*, loans and other payments were made to insiders in excess of $1 billion.

> *Fifth*, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protection offered in certain foreign jurisdictions.

65.     Defendants knew of FTX's deficient internal controls and its misappropriation of Class Member funds, often by way of Alameda and "loans" to insiders, as well as Alameda's margin trading and other risk-taking activity on the FTX platform long before Mr. Ray. Indeed, Defendants facilitated these very failures, but affirmatively concealed them from the public for their own financial gain.

66.     The losses sustained by SBF's victims are staggering. FTX stole more than $8 billion in Class Member funds, the bulk of which has now vanished. Many Class Members came of working age in the recession and, later, the COVID-19 pandemic, and as a result have spent their lives working long hours for low wages, often across multiple jobs or in the gig economy. Unlike Defendants, these Class Members do not have money to burn. They are not "crypto-bros." They are financially vulnerable, and SBF, with the help of his co-conspiring Defendants, exploited

their vulnerability for tremendous financial gain. Now, while SBF rests comfortably at his parents' home in Palo Alto, flush with the resources to post $250 million bail, SBF's victims are left with nothing.

**D. Defendants' Roles in the Fraud**

67.     The FTX fraud was a towering house of cards, and one that SBF could not have built on his own. SBF needed Defendants' assistance to achieve fraud of this scale. Defendants happily enlisted, with each agreeing, at least impliedly, to undertake certain overt acts in furtherance of SBF's scheme, including by providing state-of-the-art infrastructure, capital injections, and necessary cover for the fraud.

**(1) Defendant Banks**

**a.  *Silvergate***

68.     Defendant Silvergate provided critical assistance to SBF, including by accepting wires of Class Member funds directly into accounts held by Northern Dimension, Alameda's clandestine wholly owned subsidiary, though the wires were clearly designated as Class Member funds and had no business going into North Dimension's accounts; comingling those funds with Alameda's own monies; and transferring Class Member funds to other accounts controlled by SBF.

**(1)     Silvergate's role in the FTX fraud triggered an investigation by Congress.**

69.     So prominent was Silvergate's assistance to the FTX fraud that it now has the attention of Congress. In a bipartisan letter to Silvergate CEO Alan Lane, dated December 5, 2022, Senator Elizabeth Warrren, Senator John Kennedy and Representative Roger Marshall expressed concern that Silvergate's assistance to FTX violated the Bank Secrecy Act, 12 U.S.C. § 1829(b) and 31 U.S.C. § 5311, *et seq.* ("BSA"), under which "Silvergate is required to monitor and report suspicious financial activity carried out by its clients." Of particular concern to Senators Warren

20

and Kennedy and Representative Marshall was that:

> Silvergate provided banking services to both Alameda and FTX, raising questions about the bank's role in facilitating the improper transfer of FTX customer funds to Alameda. Apparently, "[s]ome FTX customers continued to send wire transfers" to Alameda's Silvergate account "as recently as this year." It appears that Silvergate did nothing to halt these activities.

> The arrangement between FTX and Alameda, which depended on your bank's depository services, is just one example of the "lax record-keeping and poor centralized controls at the heart of the [FTX] empire's unraveling" – and may have been illegal. Alameda's depository account with your bank appears to be at the center of the improper transmission of FTX customer funds. Silvergate's failure to take adequate notice of this scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program, as required under the Bank Secrecy Act (BSA). What's more, your bank's failure to report these suspicious transactions to the Financial Crimes Enforcement Network (FinCEN) may constitute yet another violation of the law.

> [. . .]

> Your bank's involvement in the transfer of FTX customer funds to Alameda reveals what appears to be an egregious failure of your bank's responsibility to monitor for and report suspicious financial activity carried out by its clients.

70.     Silvergate is well aware of its legal and regulatory obligations to conduct due diligence on and monitor for suspicious activity by its customers, including FTX. Indeed, it reportedly employs "twice as many compliance staff as a comparable bank of its size." In annual reports filed with the U.S. Securities and Exchange Commission (the "SEC"), Silvergate summarized its compliance with those requirements, disclosing that:

> [The BSA and the U.S. PATRIOT Act] [1] and related rules and regulations impose requirements and limitations on specified financial transactions and accounts and other relationships intended to guard against money laundering and terrorism financing. The principal requirements for an insured depository institution include (i) establishment of an anti-money laundering program that includes training and audit components, (ii) establishment of a "know your customer" program involving due diligence to confirm the identities of persons seeking to open accounts and to

---

[1] For the sake of clarity, Plaintiff O'Keefe does not allege that these standards create a private cause of action. Rather, these standards are alleged herein only to illustrate customary practices and procedures in the banking industry, which, in combination with the facts on hand to the Defendant Banks as further alleged herein, demonstrate the Defendant Banks' knowledge of the FTX fraud.

deny accounts to those persons unable to demonstrate their identities, (iii) the filing of currency transaction reports for deposits and withdrawals of large amounts of cash and suspicious activities reports for activity that might signify money laundering, tax evasion, or other criminal activities, (iv) additional precautions for accounts sought and managed for non-U.S. persons and (v) verification and certification of money laundering risk with respect to private banking and foreign correspondent banking relationships.

[. . .]

The Bank has established appropriate anti-money laundering and customer identification programs. The Bank also maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act. The Bank otherwise has implemented policies and procedures to comply with the foregoing requirements.

Silvergate's website further details that its diligence includes "site visit[s]" and a "review of organization's culture of compliance."

71.     In a letter filed with the SEC on December 5, 2022, CEO Alan Lane reiterated Silvergate's compliance with its regulatory diligence and monitoring obligations, writing that:

Silvergate operates in accordance with the Bank Secrecy Act and the USA PATRIOT Act. For each and every account, these laws require us to determine the beneficial owner, the source of funds, and the purpose and expected use of funds.

Silvergate also monitors transaction activity for every account and identifies activity outside of the expected usage. When we identify certain kinds of activity, we are required to file suspicious activity reports, and we do so routinely.

72.     Silvergate carried out this diligence on FTX. In his letter to the SEC, Mr. Lane reported that "Silvergate conducted significant due diligence on FTX and its related entities including Alameda Research, both during the onboarding process and through ongoing monitoring, in accordance with our risk management policies and procedures and the requirements outlined above."

73.     This and other diligence was available to Silvergate, but not to Class Members.

From it, Silvergate could see that SBF and his affiliates were misappropriating Class Member funds contrary to FTX's public representations including by way of the omissions set forth in Paragraph 58. But Silvergate benefited tremendously from the rapid spread of SBF's fraudulent scheme, so Silvergate helped to perpetuate the fraud despite this knowledge.

**(2)   Silvergate provided high risk, non-routine banking services to FTX in furtherance of the fraud.**

74.   In service of its own profits, and despite its awareness that FTX was misappropriating Class Member funds by way of Alameda, Silvergate opened and serviced approximately 20 accounts for FTX, Alameda, North Dimension, and other FTX affiliates under SBF's ownership and control, and assisted in the transfer of Class Member funds to SBF through them. Silvergate also extended loans to FTX entities, including BlockFi, which were secured, upon information and belief, by Class Member funds.

75.   These services were critical to SBF's fraud, and Silvergate was one of few domestic banks willing to provide them to FTX, as major financial institutions, "[w]ary of an emerging asset class that had been linked to money laundering and illegal drugs, . . . refused to bank crypto exchanges and started blocking transfers by customers to buy cryptocurrencies." SBF admitted to facing difficulty opening accounts with traditional financial institutions, explaining that he deliberately added "Research" to Alameda's name in an attempt to avoid scrutiny:

> Especially in 2017, if you named your company like We Do Cryptocurrency Bitcoin Arbitrage Multinational Stuff, no one's going to give you a bank account if that's your company name. Among other things, it's a terrible company name. But also, they're just going to be like, yeah, no, we've been warned about companies with this name. You know, you're going to have to go through the enhanced process. And I don't want to bother with that right now; it's almost lunchtime

76.   Here, Silvergate saw opportunity. "For most of its 30-year history, [Silvergate] was a tiny community lender focused on financing small real estate deals, with three branches in southern California and less than $1bn of assets." But, when the crypto market began to evolve,

Silvergate identified that "banks historically have been squeamish about dealing with crypto firms, given the absence of clear regulations governing a sector infamous for fraud and financial malfeasance." Silvergate readily filled that niche. According to Silvergate's president Ben Reynolds, "[w]e needed deposits and [CEO Alan Lane] started seeing that companies like Coinbase were getting kicked out of banks. . . . So the idea was: if we can bank [crypto companies like] Coinbase, we can find deposits." In 2016, CEO Alan Lane decided to "turbocharge [Silvergate's] crypto strategy," and the "tiny real estate lender . . . went all-in on crypto." "It was completely weird," recalls a former employee.

77.     Silvergate found a steady inflow of deposits in FTX, its ultimate crypto client. By way of FTX's large deposits (deposits misappropriated by FTX from Class Members), Silvergate secured a "leadership position" in the industry that bears stark contrast to Silvergate's past operations. The FTX deposits were particularly profitable to Silvergate, because they bore little to no interest and, as a result, were "low cost . . . for the few banks that openly serve the crypto sector." With little to no cost of funds for the FTX accounts and enjoyed a larger spread, which Silvergate could use to return its own, larger profits. Indeed, Silvergate boasts that "one of the key elements of our financial success is our low-cost deposit base." FTX grew to become one of Silvergate's largest depositors, comprising approximately 10% of Silvergate's total deposits across more than 20 different accounts. So important was FTX to Silvergate's client base that a close-knit group of CEO Alan Lane's family—his son, Chris Lane, Silvergate's chief technology officer, and his sons-in law, Tyler Pearson, Silvergate's chief risk officer, and Jason Brenier, Silvergate's manager of correspondent banking—fostered the FTX relationship and serviced its accounts.

78.     Because of the importance of FTX to Silvergate's bottom line, Silvergate was willing to do anything to keep FTX's accounts, including  the provision of banking services that

carry the highest risk. For one, FTX Trading was an offshore money service business ("MSB") incorporated in Antigua, which the Financial Crimes Enforcement Network ("FinCEN"), classifies as a "high risk" customer, requiring enhanced due diligence under the U.S. banking regulations. The Federal Financial Institutions Examination Counsel's ("FFIEC's") Bank Secrecy Act/Anti-Money Laundering Manual ("BSA/AML"), last revised in 2015 (the "FFIEC Manual"), elaborates on the risks posed by MSBs, including that these customers present "a higher risk for potential money laundering activities" because they:

- Lack ongoing customer relationships and require minimal or no identification from customers.

- Maintain limited or inconsistent recordkeeping on customers and transactions;

- Engage in frequent currency transactions;

- Are subject to varying levels of regulatory requirements and oversight;

- Can quickly change their product mix or location and quickly enter or exit an operation; and

- Sometimes operate without proper registration or licensing.

79.     Notwithstanding the high-risk profile of FTX, Silvergate effected international wire and automated clearing house ("ACH") transfers by, to, and through FTX. The FFIEC Manual also identifies these services as high risk, because these transfers "can be used in the placement, layering, and integration stages of money laundering." At Silvergate, these transfers followed one of at least two patterns. First, FTX routinely wired Class Member funds directly into Silvergate accounts held by Alameda by way of North Dimension, the counterfeit electronics dealer FTX employed as front. SBF has admitted to routing Class Member funds through Alameda accounts at Silvergate, telling reporters in the wake of the fraud's collapse that "there was a time back yonder when people would wire money to Alameda and then it would be credited to FTX," "more than

half of Alameda's total position came through these wired customer funds to [Alameda's] bank accounts," totaling more than $5 billion, according to SBF. Second, FTX regularly transferred Class Member funds into Silvergate accounts held by FTX, and from there to accounts held by Alameda or by other entities separately owned by SBF. SBF misappropriated upwards of $4 billion in FTX funds in this way.

80.     Silvergate also developed proprietary blockchain software for FTX's use, providing "a first-of-its king digital currency infrastructure solution" specially designed to meet the needs of Silvergate's crypto clients. Specifically, Silvergate built and offered for FTX's use the Silvergate Exchange Network ("SEN"), a platform that allows crypto investors to transfer US dollars from their bank accounts to crypto-exchanges instantly, 24 hours a day, 7 days a week. "E-banking systems," like Silvergate's SEN, are designated high-risk by the FFEIC Manual for several reasons, including that these services can facilitate money laundering and fraud, because:

- Customer may be out of the bank's targeted geographic area or country.

- Customer may perceive the transactions as less transparent.

- Transactions are instantaneous.

- E-banking system[s] may be used by a "front" company or unknown third party.

Because of these risks, the SEN is largely unique to Silvergate, as "[t]raditional banks [are] not set up for crypto traders, who need[] to be able to transfer money at the weekends."  But Silvergate was ever willing to step up for FTX when other financial institutions would not, and with the SEN, Silvergate  "critical financial infrastructure" that FTX needed, despite the high risks that the SEN would enable fraud like that perpetuated by SBF.

81.     Not only were the services provided by Silvergate to FTX high-risk, but they were also essential to the FTX fraud. In a quote long featured on Silvergate's website, but now deleted,

SBF underscored the necessity of Silvergate to his fraudulent scheme, explaining that FTX's "[l]ife as a crypto firm can be divided up into before Silvergate and after Silvergate. . . . It's hard to overstate how much it revolutionized banking for blockchain companies," underscoring that FTX could not have committed fraud of this scale without Silvergate's assistance.

> **(3)** **Silvergate assisted FTX in diverting Class Member funds despite its awareness of the FTX fraud.**

82.     In light of the high risks posed by the services Silvergate provided to FTX, regulations and other guidance, including the FFIEC Manual, called for enhanced due diligence and ongoing monitoring of the FTX and Alameda accounts, and Silvergate obtained knowledge of SBF's fraud by conducting that diligence and monitoring.

83.     Specifically, with respect to FTX Trading and other of FTX's offshore MSBs, the FFEIC Manual required Silvergate to (1) understand the intended use and purposes of the accounts and anticipated account activity (both type and volume); (2) understand the types of products and services offered, as well as the location and markets served; and (3) conduct ongoing diligence and monitoring for suspicious activity, in each case in accordance with the BSA. This diligence and monitoring encompassed, for example:

- A review the MSB's BSA/AML program.

- A review results of the MSB's independent testing of its AML program.

- A review written procedures for the operation of the MSB.

- On-site visits.

- A review list of agents, including locations, within or outside the United States, which will be receiving services directly or indirectly through the MSB account.

- A determination whether the MSB has performed due diligence on any third-party servicers or paying agents.

- A review written agent management and termination practices for the MSB.

27

- A review written employee screening practices for the MSB.

84.     The FFIEC Manual imposed similar requirements on Silvergate's service of FTX's foreign wires and ACH transactions, including that Silvergate (1) identify the originators and beneficiaries of the transfers; (2) understand the nature and purpose of the transactions; and (3) continually monitor the transfers for suspicious activity. And, for e-banking systems, like the SEN, the FFEIC Manual called for "effective and reliable methods to authenticate a customer's identity when opening accounts online," in addition to "BSA/AML monitoring, identification, and reporting for unusual and suspicious activities occurring through the e-banking systems." Per Mr. Lane's December 5, 2022 letter to SEC, Silvergate conducted this diligence and monitoring on FTX. Echoing Mr. Lane's commitment to diligence, Benjamin Richmann, Silvergate's Managing Director of Digital Currency, assured that SEN customers, in particular, can feel "[s]afe and secure knowing that all of the other counterparties that they're trading with on SEN have gone through a . . . due diligence process" and that "compliance and due diligence is really our secret sauce."

85.     Additionally, relevant regulations, including those promulgated by the FinCEN, require Silvergate to (1) monitor for and report suspicious transactions of $5,000 or more; (2) monitor and report currency transactions in excess of $10,000; (3) implement a customer identification program; and (4) conduct due diligence on its customers, including enhanced due diligence for MSB accounts. Mr. Lane confirmed in his December 5, 2022 letter to the SEC that Silvergate conducted this diligence on and monitoring of FTX.

86.     From this diligence and monitoring, Silvergate came to know that SBF was misappropriating Class Member funds. Silvergate saw that billions in Class Member funds were being wired directly to Alameda's accounts, an entity which Silvergate knew SBF separately owned. Likewise, Silvergate saw that the billions of dollars in related party transfers from FTX to

Alameda lacked legitimate purposes, including FTX's transfers if $400 million to Alameda for "software royalties," though Alameda was neither a software company nor purported to own any, and though FTX publicly maintained that FTX and were kept "separate in terms of day-to-day operations." So did Silvergate see that, after transferring Class Member funds to Alameda, SBF looted those funds in the form of hundred-million-dollar loans to himself and to his lieutenants. Despite this knowledge, Silvergate agreed to provide services to FTX that were vital to SBF's fraud. SBF's fraud was, in turn, vital to Silvergate's success.

87.     Silvergate's willingness to take on FTX, and to provide non-routine high risk banking services to FTX when other major financial institutions would not, paid off enormously. As of September 30, 2022, Silvergate's total deposits from all digital asset customers totaled $11.9 billion, of which FTX represented, upon information and belief, just under 10%. Within ten months of its initial public offering ("IPO") in late 2019, Silvergate's stock price skyrocketed from $12 to more than $200 per share. For as long as Class Member deposits continued to flow into Silvergate accounts, Silvergate's market capitalization would continue to grow and the value of its stock price would continue to climb. In pursuit of those profits, and despite its awareness that SBF was misappropriating those funds, Silvergate did everything it could to keep the FTX fraud afloat.

### b.  Signature

88.     Defendant Signature is another of the few cryptocurrency-friendly banks willing to assist SBF in siphoning Class Member funds through accounts held by FTX. Signature, like Silvergate, conducted diligence on FTX before opening these accounts and continued to monitor FTX's activity thereafter in accordance with the BSA and other regulatory requirements referenced above. From this diligence, Signature, like Silvergate, learned of FTX's misconduct, but because Signature, like Silvergate, profited handsomely from FTX's deposits, Signature rendered critical

assistance in furtherance of the FTX fraud.

**(1)**     **Signature has a history of aiding the fraudulent activity of its customers.**

89.     FTX would not be the first fraudulent enterprise for which Signature knowingly rendered necessary services. For years now, Signature has taken on accounts from crypto clients known to be engaged in criminal activity. For example, in 2018, Signature agreed to service accounts for Bittrex, Inc. ("Bittrex"), a Seattle-based cryptocurrency exchange, after Wells Fargo closed Bittrex's accounts and turned away Bittrex's business. At the time, Bittrex had received subpoenas from U.S. regulators and was, shortly thereafter, sued by New York Attorney General Letitia James for fraud. More recently, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") hit Bittrex with more than $60 million in fines for violations of the BSA. These investigations uncovered that Bittrex often opened accounts—including, upon information and belief, at Signature—under aliases such as "Give me my money," "Elvis Presley," Donald Duck," and other clearly fake names. The investigations also revealed that Bittrex, like FTX, made false statements regarding its financial statements in order to cover up significant losses and to keep customer deposits coming in. Not only did Signature take on—and never close—the Bittrex accounts, but Signature subsequently hired Jeffrey Wallis, Bittrex's former banker, to work as Signature's Vice President and Senior Manager of Digital Asset Solutions.

90.     Signature's readiness to take on crypto clients like Bittrex and FTX was hugely profitable to the bank. Signature's deposits rose from $30 billion in 2017 to $106 billion in 2021, growth that veterans in the banking industry describe as "absurd." By early 2022, Signature became, for the first time, an S&P 500 company. Signature credits its shift in focus to the crypto industry for this ascendant growth.

### (2) Signature provided high risk, non-routine banking services to FTX in furtherance of the fraud.

91.    Sometime in or before 2020, FTX opened its first accounts at Signature, including accounts for Alameda and multiple shell companies, and, upon information and belief, Signature effected international wire transfers and ACH transactions between the accounts, including transfers of Class Member funds into accounts held by Alameda or other entities that SBF separately owned.

92.    In late 2020, Signature expanded the services provided to FTX. On November 25, 2020, SBF tweeted that FTX customers could now move money into and out of FTX accounts by way of Signet. Signet is Signature's "state-of-the-art," "proprietary block-chain based payment solution," "specifically designed to meet the needs of innovative firms building and impacting the next generation of advancements in the fintech arena." Like Silvergate's SEN, Signet is a private blockchain that permits crypto customers to transfer funds instantaneously at any time of day on any day of the year. And like Silvergate's SEN, Signet presents significant risks, which Signature acknowledged in filings with the SEC:

> [T]he digital asset industry is somewhat nascent and the use of digital assets in financial transactions is an emerging practice. Certain characteristics of digital asset transactions, such as the speed with which such transactions can be conducted, the ability to transact without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, and the anonymous nature of the transactions, can make digitals assets vulnerable to fraud, money laundering, tax evasion and cybersecurity risks.

In light of these risks, Signature provides access to Signet, which it refers to as a "walled garden," very selectively. As Signature's co-founder and chairman, Scott Shay, explained, Signature "take[s] a minority of accounts that apply to [join Signet] because we go through a vetting process that is substantial so to get into the gated community [*i.e.,* Signet], and Signature "require[s] you to have certain financial wherewithal and to be a solid citizen."

93.     Key to Signature's rapid rise, Signet has revolutionized the crypto industry. Dimitry Tokarev, CEO of Copper, a London-based crypto exchange, explained the essential nature of Signature's services as follows:

> Cryptocurrency's progression into mainstream finance has been hamstrung by a series of issues. . . . We believe we are building the infrastructure for the next generation of financial services, and this integration with Signature Bank's Signet platform demonstrates how innovation, collaboration, and a commitment to building products for our clients will enable crypto to take its place in the financial services mainstream. We now look forward to further integrating our framework with additional Signature Bank products and services.

94.     Signet similarly enabled the FTX fraud, and Signature worked with SBF so that he could take full advantage of Signet in misappropriating Class Member funds. In October 2021, SBF and Signature collaborated to fully integrate FTX with Signet, such that FTX customers, including Class Members, could transfer funds instantaneously into FTX's Signet accounts. With this integration, Signet took off and, at its high point, was processing almost a trillion dollars in transactions per year.

95.     Months later, Signature partnered again with FTX to reconfigure Signet so that customers could initiate real-time Fedwire transactions directly through the platform, a move that SBF lauded as critical to FTX's continued growth:

> FTX CEO and Founder Sam Bankman-Fried commented on [Signature]'s new Fedwire transfer feature: 'Partnering with Signature Bank, an established financial institution and fintech pioneer, will allow us to continue to grow our business by leveraging all the advantages and key aspects of Signet. The implementation of an API-enabled, blockchain-based digital payments platform to initiate blockchain transactions and Fedwire transactions via Signet is just the latest move toward revolutionizing the payments industry through the power of blockchain technology.'

96.     Notably, while multiple of SBF's shell companies held bank accounts at Signature, only one had access to Signet. It was not FTX US. It was not FTX Trading. It was Alameda:

| Debtor | Bank Name | Last Four Digits of Account No. |
|---|---|---|
| Alameda Research LLC | Signature Bank | 5489 |
| Alameda Research Ltd | Signature Bank | 9485 |
| Maclaurin Investments Ltd. | Signature Bank | 2685 |
| Blockfolio, Inc. | Signature Bank | 4174 |
| FTX Europe AG | Signature Bank | 7500 |
| FTX Trading Ltd | Signature Bank | 9964 |
| FTX Trading Ltd | Signature Bank | 9018 |
| FTX Ventures Ltd | Signature Bank | 7872 |
| Hive Empire Trading Pty Ltd | Signature Bank | 3087 |
| Ledger Holdings Inc. | Signature Bank | 8106 |
| Ledger Prime LLC | Signature Bank | 5385 |
| Ledger Prime LLC | Signature Bank | 5377 |
| Paper Bird Inc | Signature Bank | 8701 |
| West Realm Shires Inc. | Signature Bank | 7436 |
| West Realm Shires Services Inc. | Signature Bank | 2804 |
| West Realm Shires Services Inc. | Signature Bank | 3976 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| West Realm Shires Services Inc. | Signature Bank | 6989 |
| FTX Lend Inc. | Signature Bank | 7651 |
| Crypto Bahamas LLC | Signature Bank | 5171 |
| Good Luck Games, LLC | Signature Bank | 7432 |
| Goodman Investments Ltd. | Signature Bank | 2903 |
| West Realm Shires Financial Services Inc. | Signature Bank | 9812 |
| Alameda Research LLC | Signet | 5489 |

Accordingly, Class Member funds pouring into Signet were received not by FTX, but by Alameda. There were no other FTX accounts on Signet into which those funds could have flowed. SBF's funneling of Class Member funds into Alameda's Signet account was unbeknownst to Class Members, but fully known to Signature, who held the keys to Signet's "walled garden."

> **(3)** **Signature rendered assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds.**

97.   With its provision of Signet, along with its servicing of FTX's MSB accounts, international wire and ACH transactions, Signature supplied integral assistance to FTX in furtherance of SBF's fraud.

98.   Signature provided these services to FTX despite its awareness that FTX was engaging in improper activity and misappropriating Class Member funds. Like Silvergate, Signature is a state chartered bank insured and regulated by the FDIC. As such:

> [Signature] must also comply with the anti-money laundering ("AML") provisions of the Bank Secrecy Act ("BSA"), as amended by the USA PATRIOT Act, and implementing regulations issued by the FDIC and the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury. As a result, [Signature] must obtain and maintain certain records when opening

accounts, monitor account activity for suspicious transactions, impose a heightened level of review on private banking accounts opened by non-U.S. persons and, when necessary, make certain reports to law enforcement or regulatory officials that are designed to assist in the detection and prevention of money laundering and terrorist financing activities.

[. . .]

FinCEN's regulations implementing the BSA include express requirements regarding risk-based procedures for conducting ongoing customer due diligence. Such procedures require banks to take appropriate steps to understand the nature and purpose of customer relationships. In addition, absent an applicable exclusion, banks must identify and verify the identity of the beneficial owners of all legal entity customers at the time a new account is established. We have incurred, and are likely to continue to incur, certain costs associated with the expansion and maintenance of our AML program in accordance with maintaining our AML program in ongoing compliance with applicable regulatory requirements as they may evolve from time to time.

99.    Accordingly, because it serviced FTX's MSB accounts and because it offered international wires, ACH transfers, and Signet to FTX, Signature was required, under the PATRIOT Act, the BSA, and other anti-money laundering regulations, to conduct the same enhanced due diligence and ongoing monitoring outlined in Paragraph 82 to Paragraph 85 above.

100.    Signature's public statements and other records show that Signature completed this required diligence and monitoring on FTX, including, for example, subjecting Alameda to the same "strenuous KYC/AML [*i.e.*, know your customer/anti-money laundering] process" standard for all Signet customers. Signature's diligence also encompassed one-on-one meetings with SBF, including at least one meeting at Signature's offices where SBF met with a handful of executives, such as Sarmen Saryan, Signature's Group Director of Digital Asset Banking, pictured with SBF below:



101. From this diligence and monitoring, Signature could see that SBF and his affiliates were misappropriating Class Member funds contrary to FTX's public representations, including by way of the omissions set forth in Paragraph 58. Signature knew, for example, that Alameda was separately owned by SBF, and that FTX was misappropriating customer deposits by way of transfers between FTX's accounts and those held by Alameda, including through Signet, Signature's "walled garden." Still, motivated to keep deposits flowing into the FTX accounts, Signature provided critical assistance in the form of the high-risk, non-routine banking services summarized herein in furtherance of the FTX fraud, despite this knowledge.

### c. Defendants Deltec, Moonstone, and Chalopin

102. Defendants Deltec, Moonstone, and Jean Chalopin primarily assisted SBF in trafficking Class Member funds across the U.S. border. Defendant Deltec, at Mr. Chalopin's direction, provided one-of-a-kind digital asset banking services to FTX and, upon information and belief, served as a primary vehicle through which SBF routed Class Member funds offshore,

beyond the reach of U.S. regulators and law enforcement. Defendant Moonstone, also at the direction of Mr. Chalopin, provided complementary services, assisting SBF in funneling more than $50 million in Class Member funds to entities he separately owned through accounts at the bank.

103.     Mr. Chalopin is a veteran of the crypto industry. As the chief executive of Deltec, he spent years assisting the Bahamian government in "transform[ing] the country into a sandbox for digital asset startups." Through these efforts, Mr. Chalopin developed close ties to FTX. With FTX, Deltec co-hosted a crypto summit in The Bahamas, at which Mr. Chalopin touted that "Deltec has been a long-time friend of FTX, and it is our pleasure to support them." FTX, in turn, was a great friend of Deltec. In October 2021, Deltec's parent company, Deltec International Group, received a $50 million loan from Norton Hall Ltd., an entity controlled by Ryan Salame, CEO of FTX's Bahamian outfit.

104.     From its longstanding, close ties with FTX, Deltec gained an awareness of FTX's fraud. Nevertheless, Deltec, at Mr. Chalopin's direction, assisted FTX in moving Class Member funds offshore. These funds included, upon information and belief, not only Class Members' U.S. dollar deposits, but also Class Members' cryptocurrencies, as Deltec is one of few banks that offer the services necessary to do that, including banking and taking custody of cryptocurrencies, as well as trading, lending & borrowing digital assets.

105.     When it collapsed, FTX and other entities under SBF's control held no fewer than 17 accounts at Deltec in currencies of various kinds, and SBF funded those accounts using accounts held, upon information and belief, at Defendants Silvergate and Signature:



106.    Later, by way of his close ties with SBF, Mr. Chalopin sought funding from FTX for his other bank, Defendant Moonstone. Janvier Chalopin, Moonstone's chief digital officer and Mr. Chalopin's son, reports that they "pitched [Alameda Research] the whole roadmap" to invest in Moonstone, which he claimed would fill "the massive gap in banking in the U.S. for digital assets businesses." The Chalopins succeeded. In January 2022, Alameda invested $11.5 million in Moonstone—nearly double the bank's net worth at the time.

107.    Moonstone was not always flush with such large inflows of capital. Until recently, Moonstone was the 26th smallest of 4,800 banks in the United States with a single branch in Farmington, Washington, a town of only 150 residents. In 2010, the bank's president bragged that it did not offer credit cards and held more deposits than loans outstanding. That changed in 2020, when Mr. Chalopin purchased Moonstone, purportedly to support the "underserved cannabis industry," and now serves as its chairman and CEO.

108.    Upon Alameda's investment in Moonstone, Moonstone promptly applied, and was approved, to become a member of the Federal Reserve. With that, FTX gained access to a third point of entry to the US banking system, and FTX promptly took advantage of these services,

depositing $50 million in Class Member funds across two accounts. At the time of the fraud's collapse, FTX was Moonstone's largest customer, and Moonstone, for its part, benefited tremendously from this *quid pro quo*. With FTX's accounts, Moonstone's deposits jumped to $71 million in the third quarter of 2020, a 600% increase from Moonstone's historical average.  In pursuit of continued growth and unprecedent profits, Moonstone, at the direction of Mr. Chalopin, gladly took action in furtherance of SBF's fraud.

109.    Deltec and Moonstone provided these services despite their awareness of SBF's fraud. From their close ties with SBF by way of Mr. Chalopin, from working closely with FTX in proselytizing on behalf of the crypto industry, and from pitching Alameda "the whole roadmap" for investments, Deltec and Moonstone knew, for example, that Alameda was owned by SBF— separately from FTX—and that FTX was misappropriating Class Member funds by funneling them through accounts under SBF's control at Deltec and Moonstone. Nevertheless, Deltec and Moonstone took overt acts in furtherance of the FTX fraud, with Moonstone providing FTX access to the U.S. banking system, and effecting transfers of Class Member funds into accounts under SBF's control; and Deltec, in turn, helping SBF fence Class Member funds, including those held in accounts at Silvergate, Signature, and Moonstone, across the U.S. border and beyond the reach of U.S. law enforcement. SBF could not have perpetuated the fraud without these services.

### (2)  Defendant VCs

110.    Defendant VCs are some of the largest in the world and wield enormous influence in spurring the development of emerging industries, like crypto, and persuading others to invest in the portfolio companies that they advise and nurture. From these positions of power, Defendant VCs provided critical funding for SBF's fraudulent scheme, pumping billions into FTX's coffers, without which SBF could not have launched the venture. These were not passive investments; Defendant VCs' assistance went much further than underwriting FTX's launch. Defendant VCs

also supplied FTX with hands-on support, partnership, guidance, infrastructure, networks, endorsements, promotion, publicity, cover and other assistance vital to the fraud. Each Defendant VC worked closely with FTX in providing these services and, in turn, driving up FTX's valuation, all by way of SBF's fraudulent scheme and expanding SBF's reach to victims.

> a.  **Defendant VCs pumped billions of dollars into FTX, and FTX returned the favor.**

111.   On July 20, 2021, certain Defendant VCs, including Paradigm, Sequoia, Thoma Bravo, Temesek, SoftBank Defendants, Ribbit Capital, Altimeter, Multicoin, and Sino Global, put up $1 billion in Series B funding for FTX Trading. SBF remarked that through this round of fundraising, "we've formed a hugely valuable set of partners" in these Defendant VCs. SBF explained after the Series B funding closed that "[t]he primary goal of the raise was to [find] strategic allies who can help FTX grow its brand."

112.   Shortly thereafter, on October 21, 2021, certain Defendant VCs, including Temasek, Sequoia, Tiger Global, and Ribbit Capital, among others, put up $420.69 million in FTX Trading's Series B-1 funding. In the press release announcing the fundraising, SBF repeated a common refrain, underscoring FTX's safety:

> We are focused on establishing FTX as a trustworthy and innovative exchange by regularly engaging regulators around the world, and constantly seeking opportunities to enhance our offerings to digital asset investors. For this round, we capitalized on those strides and were able to partner with investors that prioritize positioning FTX as the world's most transparent and compliance cryptocurrency exchange.

113.   FTX reportedly referred to the Series B-1 fundraising as a "meme-round," referencing the allusions to oral sex and marijuana embedded within the amount raised. This was one of many juvenile references made by FTX regarding core components of its business model. For example, FTX advertised to investors that one of the products unique to the exchange was its

"Shitcoin Index Futures," a "funny named" futures product built on "shit" cryptocurrencies.

114.    Though FTX Trading claimed that the Series B-1 funding would help it "make strategic investments designed to grow the business and expand [its] regulatory coverage," in October 2021, during the height of its Series B-1 fundraising, FTX instead diverted $300 million—equivalent to nearly 75% of the Series B-1 funding—to SBF in exchange for shares he owned in the company. Pay days of this kind are unusual and indicative that something is amiss. As industry experts explain:

> Generally, venture investors frown on large sales of stock by founders before a company goes public, in part because they dislike the idea of a founder who put little or no money into a business getting rich before investors can cash out. . . . It shows the company's founder thinks there's a better place to invest. . . . Anytime you see a founder selling shares in a secondary offering, you have to really ask them pretty tough questions.

To be sure, not only was SBF's cash out "large by startup-world standards," it also directly contradicted FTX Trading's purported use for the funds. Moreover, it was money that could have—and should have—been paid to satisfy the claims of SBF's victims.

115.    Unphased by SBF's $300 million payday, Defendant VCs put up more money. On January 31, 2022, FTX Trading announced that it had raised $400 million in Series C Funding from investors, many of whom had participated in its Series B and B-1 rounds of fundraising, including Temasek, Paradigm, SoftBank Defendants, and Tiger Global, "demonstrating [their] belief in the Company's vision and their continued support of FTX's explosive growth."

116.    Just days earlier, on January 26, 2022, FTX US closed on its $400 million Series A fundraising, securing yet more money from certain Defendant VCs, including Paradigm, Temasek, Multicoin, and SoftBank Defendants. In publicizing the deal, Brett Harrison, President of FTX US, affirmed FTX's commitment to regulatory compliance, stating that "[w]e're excited to continue working cooperatively with [lawmakers and regulators], and feel confident that FTX US

will emerge as the leading US-regulated crypto spot and derivatives exchange."

117.    In announcing each round of funding, Defendant VCs publicly endorsed FTX and its founder. After fundraising closed, Defendant VCs continued to valorize SBF and promote FTX to the public. For example, in a profile spanning 20 pages and published on its website until recently, Sequoia boasted "the possibility that FTX could join—or even eclipse—the big four of American banking (JPMorgan Chase, Bank of America, Wells Fargo and Citibank)."

118.    In total, Defendant VCs put up a combined $2 billion to expand FTX's reach to SBF's victims. SBF returned the favor in kind, investing in his VC-backers as they had in him: entities "controlled by SBF have committed more than $200 million to [Defendant] Sequoia-related funds" and millions more to Defendants Paradigm, Altimeter, Multicoin and Sino Global. Upon information and belief, some or all of these investments were paid for with, or collateralized by, Class Member funds.

119.    In garnering investments into their own funds, Defendant VCs worked closely with SBF. For example, in 2021, Sino Global partnered with FTX as a co-general partner and "anchor" investor in building Sino Global's $200 million Liquid Value I fund. SEC filings reveal that Alameda, too, invested in the Liquid Value I fund. Sino Global's managing partner Matthew Graham and SBF worked hand-in-hand to pitch the fund, as the following slide from the investor deck demonstrates:



The short biography of SBF in the lower right-hand corner of the slide further illustrates what all Defendant VCs knew. SBF owned both FTX and Alameda Research. Thoma Bravo certainly knew this—Orlando Bravo, Thoma Bravo's founder and managing partner, tweeted on July 20, 2021, that he was "[s]o proud" to be backing both "SBF_Alameda" and the "FTX_Official" team:



       **b.**    ***Defendant VCs gained awareness of SBF's fraud in the course of investing in, advising, and promoting FTX.***

120.    Defendant VCs had knowledge of FTX's misconduct, because, prior to investing, each Defendant VC undertook a diligence process to evaluate FTX's offerings and understand its business model and operations. Defendant VCs were obligated to conduct this diligence, as fiduciaries to their investors. Diligence of this kind occurs in multiple stages, and industry standards require a review of the target's financial statements and projections, identification of the target's basic corporate governance structures and internal controls, an understanding of the target's business model (as confirmed by the target's financial statements), and an evaluation of the founders' track records and relevant experience. Venture capital firms conduct diligence for a living, and Defendant VCs are the largest and foremost of those firms. Firms of such stature undertake state-of-the-art diligence on the investments they make, and Defendant VCs conducted the same top-notch, rigorous diligence on FTX.

121.    Temasek, for example, reports that it conducted eight months of diligence, including "significant regulatory and licensing due diligence on the business model of FTX, particularly on financial regulations, licensing, anti-money laundering (AML) / Know Your Customer (KYC) and sanctions across multiple jurisdictions[,] a review of [FTX's] audited financial statements and a cybersecurity review." Temasek further reports that "[t]hroughout the multiple rounds of due diligence," Temasek specifically "enquired about the relationship, preferential treatment, and separation between Alameda and FTX," and "gathered qualitative feedback on FTX and [its] management team based on interviews with people familiar with the company, including employees, industry participants, and other investors." Temasek's diligence was ongoing after fundraising closed, and "[p]ost investment, Temasek continued to engage management on business strategy and monitor performance."

122.     Sequoia likewise "do[es] extensive research and thorough diligence on every investment [it] make[s]" and, accordingly, it ran FTX "through a rigorous diligence process." This diligence included, for example, spending "months researching the [crypto] space full time," with a focus on "the [crypto] exchanges," surveying the entire "landscape" of the crypto industry, hosting ZOOM meetings between Sequoia partners and SBF, and sending a reporter to FTX's Bahamian headquarters, where he was "embedded . . . for a full week" "sitting at a desk ten feet away from SBF," and during which time, he reports, "SBF was under [his] microscope." Sequoia partner Michelle Bailhe confirmed, as a guest on FTX's own podcast, that, when it came to FTX, "[w]e did our homework way in advance. We knew FTX was this amazing company and we also knew [SBF] was an amazing founder." Sequoia's diligence continued after fundraising closed, from which time Sequoia partner Alfred Lin reportedly worked closely with FTX and, upon information and belief, served on FTX's advisory board.

123.     Thoma Bravo similarly scrutinized FTX before joining the capital stack, with partners Orlando Bravo and Tre Sayle personally conducting diligence on FTX during the fundraising rounds. Thoma Bravo summarized its investing process in documents filed with the SEC, and describes its approach as one that "stresses the importance of conducting comprehensive due diligence on prospective investments" and "approach[es] every potential transaction committed to a diligent, rigorous, and comprehensive due diligence process." In those documents, Thoma Bravo further details its diligence process, noting that

> In evaluating a prospective initial business combination, we expect to conduct a thorough diligence review that will encompass, among other things, interviews with industry competitors, customers, suppliers and former employees and an analysis of relevant issues, risks and opportunities, including certain environmental, social and governance (ESG) risk and opportunities, as well as a review of other information that will be made available to us.

Upon information and belief, Thoma Bravo adhered to this approach before investing in FTX and,

thereafter, partner Orlando Bravo continued to monitor and advise FTX, including as a member of FTX's advisory board.

124.    Paradigm likewise conducted diligence standard among VCs before investing in FTX. Paradigm was formed by veterans of the venture capital and cryptocurrency industries:  co-founder Matt Huang was a partner at Defendant Sequoia before launching Paradigm, where he "[led] the firm's cryptocurrency efforts," while co-founder Fred Ehrsam previously co-founded Coinbase, the largest cryptocurrency company in the US. Messrs. Huang and Ehrsam now serve as managing partners of Paradigm, where the firm is guided by the "strongly-held belief" that:

> [T]he best way for us to contribute to this revolution [is] to build an investment firm uniquely adapted to crypto, so that we [can] be the best possible partner to crypto entrepreneurs and communities. We've immersed ourselves in the frontier of protocol research and the culture of Web3. And we've built a team of domain experts around research, engineering, security, talent, communications and marketing, legal and policy, and everything else crypto entrepreneurs might need to advance their projects.

FTX is more than a portfolio company for Paradigm; it is also a client and co-investor. In November 2021, for example, SBF invested $20 million dollars in Paradigm's $2.5 billion venture fund known as "Paradigm One," a fund solely focused on crypto companies and which was, at the time, the largest of its kind. Upon launching the fund, Paradigm invested in a number of crypto startups, including Jambo Technology, an African crypto "super app" in which Alameda had also invested millions of dollars. Jambo Technology executives recall that Paradigm's due diligence process was "the most intense," during which time members of the startup would "wak[e] up and go[] to sleep with DD [*i.e.*, due diligence] questions" from Paradigm. Upon information and belief, Paradigm's diligence of its investments in FTX was no different, and Paradigm, too, continued to monitor its investment with a seat on FTX's advisory board.

125.    Tiger Global also completed comprehensive diligence on FTX, as it does on all of

its investments. Indeed, when it comes to diligence, Defendant Tiger Global holds a reputation for "deploy[ing] an army of wall street types who have cut their teeth working 100 hours a week for years" and whose "work ethic shines through when they do due diligence." Entrepreneurs who have undergone Tiger Capital's diligence report that:

- "It's incredible how thorough they are. . . . They know more than any other investor I've ever met, they sign NDAs, and they came to the first meeting with their own product roadmap, revenue and customer projections . . . ."

- Tiger's "analysis of the market segment, advantages/disadvantages . . . . was very thorough. They are not spraying for sure."

- In conducting diligence, Tiger Capital "[a]sks very deep thoughtful questions. . . . no BS."

- "Anyone who says Tiger doesn't diligence is deeply mistaken. . . . They have (multiple) Bain teams on retainer that do DEEP dives into market and competition, including multiple customer and expert calls, full market sizing, product research, and also cut through unit economics. The deck we got was 50+ pages of detail from Bain that the Tiger team cuts through to present to their senior guys."

- "Re Tiger – anyone who claims they skip DD [*i.e.*, due diligence] is hugely mistaken. They come prepared – no bullshit - full conviction and ready to do the deal. The partners personally jump on reference calls with clients where required to validate and learn. The Bain thing is true and very useful – yes, they do outsource the administrative part to the [Bain] team [in] India – but once the requirement is identified and the scope agreed – a local, specialist team is assembled to give all the focused assistance required."

Upon information and belief, Tiger Capital applied the same thorough diligence to FTX and to its founder, SBF.

126.     Softbank Defendants, too. At the time it invested in FTX, Softbank Group reported to its investors that it conducted the following diligence on its investments:

In the investment decision-making process, Softbank seeks to appropriately estimate the investment target's equity value and to assess risks related to the target's businesses, finances, corporate governance, compliance, and internal controls, by conducting due diligence on the target's business, technology, business model, market size, business plan, competitive environment, financial condition, legal compliance, etc. For this purpose, Softbank ensures the involvement of, for

example, outside financial, legal, and tax advisors, in addition to the relevant internal departments. In addition, an objective review of the adequacy of the due diligence findings is carried out by a dedicated review department.

Upon information and belief, Softbank Group subjected FTX to the same diligence process prior to investing hundreds of millions of dollars in FTX.

127.    Like other Defendant VCs, Altimeter maintains a business strategy requiring "[d]eep, fundamental analysis" of its potential investments, and, upon information and belief, Altimeter subjected FTX to the same careful diligence process. In the time leading up to its investments in FTX, Altimeter described in SEC filings the diligence it conducts on companies like FTX, explaining that Altimeter's "investment team spends significant time conducting primary due diligence as part of its fundamental bottoms-up research process," and "Altimeter aspires to be domain experts in the markets and business in which it invests."

128.    Sino Global also engages in "quality due diligence" before partnering with the companies in which it invests, including FTX. Managing partner Matthew Graham reports that Sino Global "do[es] a hell of a lot of due diligence. People know that if [Sino Global is] going to invest in them, I'm definitely going to be asking around about them. We'll ask people they used to work with what it's like being on the same team with them. . . . I've got to get to know you. It's like we're buying a vacation house together, we're not just going for a quick dinner." Upon information and belief, Sino Global was as rigorous in conducting diligence on FTX.

129.    Multicoin, for its part, is a "thesis-driven investment firm" and co-founder Kyle Samani reports that, before Multicoin invests in startups like FTX, he and his team are "obviously, doing due diligence" in accordance with industry standards. Mr. Samani has elaborated that, 'when evaluating a potential investment," Multicoin's diligence is driven by "a few major criteria:"  (1) "Founder/market fit," including an understanding of the "founder's background that makes them

uniquely suited to solve the problem at hand;" (2) "Market size," including "[i]f the idea works as intended, how big can it get;" (3) "Defensibility," which requires understanding the "business/protocol" in order to make "it difficult for [competitors] to catch up;" "Crypto," *i.e.*, the "unique crypto angle to the investment;"  and (4) "Team," which requires understanding whether "the founders have the background and skillset to pull this off." Upon information and belief, Multicoin conducted diligence of the same rigor on FTX and, as a member of FTX's advisory board, Mr. Samani continued to monitor FTX's activity after investing in the fraudulent venture.

130.    Finally, Ribbit Capital has reported to the SEC that the "Ribbit Capital team has experience in [d]eveloping sector-specific theses based on original research, deep industry knowledge, and business diligence" and, upon information and belief, Ribbit Capital diligently vetted FTX before investing in it, in accordance with these disclosures and industry standards.

131.    From employing in-depth diligence standard in the industry, Defendant VCs knew that SBF was misappropriating Class Member funds, contrary to FTX's public representations and by way of the omissions set forth in Paragraph 58. In particular, Defendant VCs could see that (1) FTX was closely interconnected with Alameda, though SBF separately owned each entity, and SBF engaged in self-dealing by way of FTX and Alameda; (2) FTX granted Alameda exemptions and other special treatment that allowed Alameda to engage in margin trading and other risky activity on the FTX platform, exposing Class Members to Alameda's risk of loss; (3) FTX's projections were unsubstantiated and its financial statements, nothing more than "homespun excel files;" and (4) FTX lacked critical internal controls, such as separate accounts for Class Member funds, an independent board of directors, or even a chief financial officer.

132.    The entanglement of FTX and Alameda, for example, was apparent through investor presentations—now available to the public for the first time, but available to Defendant

VCs years ago—in which "some of the same assets appeared simultaneously on the balance sheets of FTX and of [SBF's] trading firm, Alameda Research[,] despite claims by FTX that Alameda operated independently." Specifically, for example, "each time FTX was seeking to raise funding, [SBF] sent a spreadsheet to potential investors displaying items like revenue, profit and losses, daily users, and expenses for FTX," and these spreadsheets showed overlap between FTX and Alameda. Other investor materials note that "FTX is a spinout of Alameda Research" and that one of the risk factors presented by FTX was its relationship with Alameda, and specifically that FTX and Alameda would engage in self-dealing by "[t]rading on their own exchange," elaborating that:

> An exchange needs a market maker to get it off the ground and Alameda will be the initial market [maker] for FTX itself. The team intends to bring on more market makers over time however this is a major risk. We have talked to other quantitative hedge funds who are hesitant to trade on FTX for this reason"

133.    The intertwining of FTX and Alameda was certainly apparent to other investors conducting diligence on the companies. Alex Pack, a venture capitalist focused on cryptocurrency investments, reports that in December 2018, he considered investing in Alameda and, after a month long due diligence period, discovered that "Alameda and FTX were tied at the hip," and that SBF planned to use Mr. Pack's investment in Alameda to fund the operations of FTX. For those reasons, Mr. Pack declined to invest in SBF's enterprise.

134.    In addition to revealing the overlap between Alameda and FTX, the pitchbooks that FTX used to solicit funds from Defendant VCs reportedly featured projections that FTX could not substantiate with viable assumptions or calculations. For example, in financials that FTX provided to investors, FTX's projected revenue figures for fiscal years 2021 and 2022 that did not reconcile with projected volumes or fees. More generally, these financials were not of the caliber expected of a $32 billion multinational corporation and instead, where "homespun Excel files," which were "very unorganized," at times "inaccurate" and "confusing." In piecing FTX together after the

fraud's collapse, Mr. Ray quickly discovered that FTX used Quickbooks for its financials, which he found obviously incongruous: "[A] multi-billion-dollar company using Quickbooks. Nothing against Quickbooks, very nice tool, just not for a multi-billion-dollar company."

135.    Defendant VCs could see, *years* before Mr. Ray could see (and was able to uncover in a matter of days), that the information presented in FTX's financial statements presented "substantial concerns;" that FTX lacked fundamental internal controls, including a chief financial officer or a board of independent directors; that FTX did not segregate Class Member funds from operations; and that control of FTX was concentrated in the hands of unsophisticated twenty-somethings who played League of Legends throughout meetings at which billions of dollars in venture capital were at stake. None of this material information was disclosed to Class Members, and SBF's fraud relied on Defendant VCs assistance in keeping the fraud in motion, and these critical omissions concealed.

      **c.**    ***Defendant VCs provided critical assistance in furtherance of the FTX fraud, despite knowing that SBF was misappropriating Class Member funds.***

136.    Still, Defendant VCs jumped at the opportunity to pour hundreds of millions each into FTX's repositories, without which FTX could not have gotten off the ground, much less enjoyed such expansive reach. Reportedly, FTX raised:

- $278 million from Defendant Paradigm;

- $275 million from Defendant Temasek.

- $210 million from Defendant Sequoia;

- $100 million from Defendant Softbank Defendants;

- $38 million from Defendant Tiger Global;

- An amount in the "mid-seven figures" from Sino Global; and

- more than $25 million from Multicoin.

137.   This funding was critical to FTX's growth. FTX needed money, and it needed money from Defendant VCs, specifically, for reasons laid bare by Sequoia in its profile of SBF:

> FTX did need money, after all. **And it needed that money from credible sources so it could continue to distinguish itself from the bottom-feeders who came to crypto to fleece the suckers**.

Without the credibility and influence attached to the enormous sums of money that Defendant VCs put into FTX, SBF could never have crafted the veneer of legitimacy, trustworthiness, and safety critical to FTX's meteoric growth.

138.   To that end, each Defendant VC vociferously, and repeatedly, promoted the legitimacy of FTX and endorsed SBF's integrity and character. Orlando Bravo, of Thoma Bravo, for example, was "one of the most prominent and vocal supporters of Sam Bankman-Fried and his crypto trading firm FTX. . . . [Mr. Bravo] told an investment conference in Cannes the company was going to be 'a big winner,' and he described Bankman-Fried as 'one of the best entrepreneurs' he had come across." After Thoma Bravo closed FTX's Series B fundraising, Mr. Bravo doubled down on his praise for FTX, and SBF, telling the press that:

> We have watched with excitement as Sam and the FTX team have successfully built the most cutting-edge, sophisticated cryptocurrency exchange in the world. While this has been an incredible accomplishment in itself, their commitment to making a positive impact on the world through their business is what sets the company apart. We are thrilled to partner with FTX on their next phase of growth as they create a new ecosystem for crypto.

Thereafter, Mr. Bravo worked to lure users to the FTX platform, tweeting on November 27, 2021, that customers should exclusively use FTX for cryptocurrency transactions, suggesting that other exchanges lack the safety and other controls that FTX offered:



And again, on June 23, 2022, Mr. Bravo tweeted, "FTX is so unique in combining innovation and rigorous operations," all the while serving as a member of FTX's advisory board.

139.     Paradigm piled on, too. In addition to advising SBF as a member of FTX's advisory board and providing assistance to FTX Trading in its Series B funding, Paradigm's co-founder and managing partner, Matt Huang, repeatedly published statements in the press testifying to SBF's good character and endorsing the FTX exchange, including after closing FTX Trading's Series B funding:

> Sam Bankman-Fried is one of those special founders whose vision is both stunningly ambitious and uniquely adapted to the future of crypto. The team's execution speaks for itself, with FTX growing to become a top global exchange in two years. There's a bright future ahead for Sam and FTX, and Paradigm is excited

to be a part of it.

And, again after closing FTX US's Series A funding:

> Paradigm has been fortunate to be an investor in FTX's global business, and we are thrilled to invest in FTX US. The team is world class and their focus on great products and regulatory engagement will help ensure access to crypto for millions of Americans

For Paradigm, FTX was unique in this regard. Though "Paradigm is not big on attention," and instead "stays out of the media limelight," Paradigm made an exception for FTX, publicly vouching for the exchange's trustworthiness and for the credibility of its "special" founder, SBF, and his "world class" team.

140.    Sequoia similarly praised FTX and its "perfect founder" SBF, with Sequoia senior partner Alfred Lin, who served on FTX's advisory board, stating in a press release announcing that FTX Trading's Series B funding closed:

> FTX is the high-quality, global crypto exchange the world needs, and it has the potential to become the leading financial exchange for all types of assets. Sam is the perfect founder to build this business, and the team's execution is extraordinary. We are honored to be their partners.

And again, after FTX Trading's Series B-1 funding closed, Sequoia partner Alfred Lin endorsed FTX as the "best overall product offering" and SBF as a "special founder":

> Sam Bankman-Fried is a special founder who is ambitious and daring enough to build the future of crypto by establishing FTX as the global exchange with the best overall product offering and leveraging the world's crypto rails to build the future of finance. We are thrilled to partner with FTX on their next phase of growth.

Michelle Bailhe, another Sequoia partner, also heavily promoted FTX in the media, appearing on FTX's own podcast in November 2021 and publishing articles on Sequoia's website proclaiming, for example, on December 17, 2021, that  "Sequoia's mission is to partner with the most daring founders in crypto and help them build something legendary. We're proud partners of [SBF] at

FTX." Sequoia also conducted promotional interviews with SBF, which Sequoia disseminated to the public through Twitter, shoring up SBF's reputation as one who doesn't "do scammy things:"



In another promotional interview, streamed to the public on April 13, 2022,  Ms. Bailhe touted SBF as an "exceptional founder and human in so many ways" and that SBF has "done what experts will tell you not to do and [SBF has] been right so many times." In the interview, Ms. Bailhe complimented SBF's purported commitment to effective altruism, helping SBF to cultivate an aura

of good faith and trustworthiness, noting that SBF is "earning to give" and that SBF "plan[s] to give away the majority of what [he] earn[s]."

141.     Multicoin admits that it "strongly and publicly endorsed [SBF] and FTX," and it did so repeatedly. Multicoin "carefully watched" FTX since its founding, and repeatedly lauded FTX and its management in public statements, including managing partner Kyle Samani's statements following the closing of FTX Trading's Series B-1 fundraising:

> We have been carefully watching the FTX team over the last two years. They are far and away the best executing team in crypto, and have blown away everyone's expectations. They have firmly established themselves as the exchange with the best overall product offering, and are now leveraging the unique capabilities of global crypto rails to build the future of internet native finance. FTX is building the future of crypto, and we are incredibly excited to invest.

And, following FTX US's Series A fundraising., Mr. Samani, who served on FTX's advisory board, reiterated his confidences in SBF and FTX:

> The FTX US team is laying the groundwork to become the dominant trading platform in the United States for all things crypto: spot trading, derivatives, and NFTs. They are growing market share as customers recognize the power and flexibility of the platform, and we expect that to accelerate as the product suite accelerates.

142.     Sino Global also heaped on the praise for FTX and its founder. Upon closing FTX Trading's Series B funding, Sino Global managing partner Matthew Graham tweeted:

> Absolutely ecstatic to let you know that Sino Global Capital participated in FTX's Series B round (in retrospect, it was inevitable). Today, SBF is no longer merely a titan of crypto. He's now a titan of business, and he and our good friends at FTX are just getting started.

143.     Ribbit Capital also peddled the virtues of FTX and SBF. In announcing FTX Trading's Series B funding, Ribbit Capital's general partner, Nick Shalek, told the press that:

> In less than two years, Sam and team have built a unique company and culture centered around staying nimble and putting their customer first. These tenants, along with a product-led approach, have propelled FTX into a top global crypto exchange. However, we don't see it stopping there. As crypto becomes more

ubiquitous, FTX has the opportunity to build a next generation financial services brand, spanning exchange, payments, and many other categories to come. The Ribbit team is excited to partner with them on their journey to grow the digital currency ecosystem and change finance.

144. Defendant VCs' commendations and endorsements were critical to the perpetuation of SBF's fraud. In summarizing FTX's success to *The New York Times*, FTX's president, Brett Harrison, explained: "We're the newcomers to the [cryptocurrency] scene. . . . The company needs to familiarize consumers with its technology, customer service and offerings, while competing with incumbents like Coinbase Global Inc. or Kraken. . . . We know that we had to embark on some kind of mass branding, advertising, sponsorship type work in order to be able to do that." Sequoia, too, recognized FTX's need for reputation laundering, noting in its 20-page profile of SBF that:

> Alameda was not immune to the exchange-level shenanigans that gave crypto as a whole its sleazy reputation. But FTX had an ambition to change that. It was built to be the exchange traders could count on. **SBF needed to get the word out. He wanted FTX to be known as the respectable face of crypto. This required ad campaigns, sponsorship deals, a charitable wing—and a war chest to pay for it all**. (emphasis added).

145. Regulators have taken note of Defendant VCs' assistance to the FTX fraud in pumping FTX with cash and repeatedly endorsing the exchange and its founder. In a key note address to The Warton School and the University of Pennsylvania Carey Law School on January 18, 2023, Christy Goldsmith Romero, Commissioner of the CFTC, remarked:

> FTX had financial support for its campaign to build trust. Some venture capital firms (and other investors) knowingly funded this trust campaign. . . . **FTX appears to have used Sequoia[, for example,] as a credibility and trust enhancer, and it used Sequoia's money to embark on a campaign to gain public trust and distinguish itself as the most trusted brand in crypto.**
>
> **It appears that Sequoia at least knew its money would be used in this fashion.** However, there are serious questions and allegations about whether this public-relations "war chest" was funded not only by venture capital money but also

customer property. If those allegations prove to be true, this could be one of the most significant breaches of trust in financial history.

**The multi-dimensional public relations campaign was meant to build the public's trust in FTX.** And I have not discussed all elements of that campaign. There were rumored efforts to influence charities and policy advocacy groups. There were efforts relating to FTX's extensive legal and political spending; and even an alleged investment in a crypto news site. All of this appears to be part of a branding campaign designed to make FTX appear trustworthy.

146.   In short, FTX told customers that what set it apart was its safety and its trustworthiness. Defendant VCs hawked these purported features of the exchange again and again, despite knowing that what they were telling the public about FTX and about SBF was unsubstantiated. "With the help of a marquee investor roster," the rest was history, and [SBF] was able to build FTX into a massively popular exchange . . . and successfully promote himself as one of the most trusted founders in all of crypto."

147.   Defendant VCs' vociferous endorsements of FTX paid off. Between the Series B and B-1 fundraising rounds, FTX's user base increased 48%, its average daily trade volume surpassed $14 billion, and its valuation jumped from $18 billion to $25 billion. At the close of the Series C fundraising round, FTX's user base grew another 60% and its valuation ballooned to $32 billion. Defendant VCs who put up money in the Series B round therefore saw the value of their stakes in FTX grow by 40% in the three months intervening the Series B and Series B-1 fundraising rounds and nearly 90% in the six months intervening the Series B and Series C rounds.

148.   Defendant VCs' assistance in furtherance of the fraud did not end with their fundraising for and promotion of FTX. SBF had "two main goals" in fundraising from Defendant VCs . In addition to raising necessary capital, SBF also sought to "form[] a lot of partnerships with people who are really excited about and who we think can help grow our business and make a lot of connections for us." Again, Defendant VCs pulled through.

149.    Each Defendant VC extended to FTX a self-professed "hands-on" investment strategy, which involved "partnering" with FTX and offering it guidance, infrastructure and expertise. For example,

- Defendant Sequoia "commit[s] to a select number of partnerships each year in companies that define categories and create markets" and is an "actively engaged partner[] who . . . dedicate[s] decades of collective company-building experience to help founders achieve their potential." Sequoia forswears passive investing, explaining, "we are sometimes called investors, that is not our frame of mind. We consider ourselves partners [with the companies in which we invest]." Indeed, Sequoia partner Michelle Bailhe confirmed on FTX's podcast that Sequoia's investment process is "not an off-hand process in which [Sequoia] invest[s] and then let[s] [its portfolio companies] go off to the races." Instead, Ms. Bailhe confirmed, "[t]here is a big active conversation throughout. . . . Because we're not just passive money. We want to be really business partners."

- Defendant Paradigm "take[s] a deeply hands-on approach to help projects reach their full potential, from the technical (mechanism design, smart contact security, engineering) to the operational (recruiting, regulatory strategy)."

- Defendant Ribbit Capital advertises that its "goal isn't just to write checks. It's to deposit and grow ideas," and in service of that "mantra," the firm promises to supply "investment focus, support, and partnership to accelerate [the] success" of its investments, in part by giving entrepreneurs "support, guidance, and running room." In filings with the SEC, [Ribbit Capital] reports that its "mission . . . is to change the world of finance by providing capital and guidance to visionary financial services entrepreneurs," and that it "strives to be more than a source of financial capital to entrepreneurs" and "approach[es] entrepreneurs as collaborators, offering data, perspectives, and lessons learned in innovative financial businesses . . . over time." In doing so, [Ribbit Capital] boasts its ability to "create meaningful, lasting relationships with entrepreneurs," like SBF.

- Brad Gerstner, CEO of Defendant Altimeter, explained that partnering closely with the founders in which Altimeter invests is what, in his view, differentiates the firm from its competitors, explaining "Most of the other hedge funds were . . . stock pickers, not founders. So I thought, I can do this in a way that's really more empathetic and more closely aligned with founders, like true venture but could scale all the way into the public markets. . . . [W]e want [founders] to know that we're side by side with them on the important issues they face—recruiting a CFO, building their board, getting the company public, helping them raise capital—and that will be first in line to write the check."

- Defendant Multicoin "will not invest if [it] cannot add value beyond capital," and boasts a team of 'hands-on investors," who "will do everything in [their] power to

maximize the success of [their] portfolio companies. Multicoin professes that what it does "best" is "invest[] with high conviction, in a hands-on way" and that what sets it apart from other VCs is that Multicoin "can dedicate real time and thought to projects as partners at the onset." According to Kyle Samani, who leads Multicoin as its co-founder and managing partner, this means that if a founder "calls you Friday at 9 p.m., you answer the phone. . . . We care about our founders, we work with them during the week and we don't like being passive investors."

- Defendant Thoma Bravo's "investment philosophy is centered around working collaboratively with existing management teams," for whom Thoma Bravo "[l]everag[es] deep sector expertise and strategic and operations capabilities." Its founder and managing partner, Orlando Bravo, believes that "you have to be hands on as an investor," and to do that, Thoma Bravo takes a "partnership-driven approach" to its founders and the companies in which it invests, and brings to them necessary "skills and experience to . . . help [its] portfolio companies excel."

- Defendant Sino Global is led by managing partner Matthew Graham, a veritable "kingmaker" in the digital assets space, whom "[m]any founders . . . swear by" and whose "vision and drive . . . helps companies and products grow." This is the "same long-term, roll-up-your-sleeves, and deep relationship approach that [Sino Global] bring[s] to portfolio companies like FTX." Indeed, Sino Global worked particularly close with FTX, and the two shared "a great working relationship" in part because FTX's "processes, values and agency aligned with [Sino Global's]." From its partnership with FTX, Sino Global reports that it derived "enormous strategic value."

- Softbank Group explains that, in investing in startups like FTX, its "role is to provide the operational expertise, global network, and patient capital" and recognizes that "[t]here are few organizations with the vision and resources to back difficult [such] ambitious global projects." Softbank Group is careful to note that it is more than a passive investor, explaining that "[a]s important as capital is, [Softbank] enables something even more powerful[:] building a unique network of portfolio companies that will collaborate and learn from each other to unlock further opportunities."

150. Defendant VCs did not deviate from their standard "hands on" approach when partnering with FTX. Indeed, upon information and belief, executives of Defendants Sequoia, Paradigm, Multicoin and Thoma Bravo served on FTX's advisory board, which held meetings at least through March 2022. Other Defendant VCs provided direct assistance to SBF's fundraising efforts, with FTX Trading reporting that its $900 million Series B funding was "led by the Company's own ventures team, with help from Paradigm [and] Ribbit Capital."

> **d.** ***Defendant VCs sought to keep the fraud concealed, and therefore afloat, until FTX could effect an IPO or a private sale.***

151.    In working with SBF to grow the FTX platform to its exponential scale, Defendant VCs obtained knowledge of SBF's misappropriation of Class Member funds, along with FTX's attendant misrepresentations and omissions. But despite this knowledge, Defendant VCs continued to provide infrastructure for and guidance on the company's trajectory, with any eye towards an IPO or private sale, the end game for venture capitalists like Defendant VCs:

> Venture money is not long-term money. The idea is to invest in a company's balance sheet and infrastructure until it reaches a sufficient size and credibility so that it can be sold to a corporation or so that the institutional public-equity markets can step in and provide liquidity. In essence, the venture capitalist buys a stake in an entrepreneur's idea, nurtures it for a short period of time, and then exits with the help of an investment banker.

For Defendant VCs, FTX was no different. In fact, in closing FTX Trading's Series B funding, SBF announced that FTX was "trying to get [itself] in a position where we could go public relatively quickly if we wanted to." Defendant VCs stood to profit enormously from FTX's public or private sale, as long as Defendant VCs could help keep the fraud afloat until FTX went on the selling block.

152.    By January 2022, an IPO or private sale was increasingly imminent. FTX Trading's valuation reached $32 billion—one of the largest valuations in recent history, greater than the market cap of both Nasdaq and Twitter—while FTX US's valuation topped $8 billion.  In announcing the valuations, SBF stated that he and others at FTX "look forward to working alongside our investors [*i.e.*, Defendant VCs] to achieve our mission and continue our tremendous growth throughout 2022 and beyond." These multi-billion dollars valuations arose directly from the fundraising by Defendant VCs; FTX could not have achieved these appraisals without the nearly $2 billion in fundraising from Defendant VCs.

153.    Just two months later, in March 2022, SBF met with David Soloman, CEO of Goldman Sachs, to discuss, among other things, FTX's IPO. With the prospect of an IPO imminent, Defendant VCs could cash out with massive returns on their equity stakes and leave Class Members to bear the losses resulting from SBF's fraud, if they could help keep customer deposits flowing into FTX accounts, and SBF's fraud would concealed, until just after the sale.

154.    By now, Defendant VCs' interest in keeping SBF's fraud concealed—and, in turn, FTX afloat—had broadened, as Defendant VCs had stakes not only in FTX, but in crypto companies throughout the industry. But by this time, the crypto industry had begun to falter, and SBF's spree to buy up failing crypto companies (so to keep his fraud concealed from Class Members) took off. For as long as Defendant VCs could keep FTX's fraud hidden from public eye, FTX could in turn shore up struggling players in the crypto industry (like it did Blockfi), including those in which Defendant VCs had an interest. In the alternative, the collapse of FTX— then the second-largest cryptocurrency exchange on the market—could potentially result in a total crash of the cryptocurrency market. With their eyes on an IPO or private sale, and determined to extricate crypto industry-wide, Defendant VCs—and Sequoia, in particular—conspired with FTX to keep Class Member funds flowing in and the fraud hidden.

155.    In furtherance of those objectives, on September 22, 2022, Sequoia prominently displayed on its website, just above its maxim, "We help the daring build legendary companies," a 14,000 word radiant profile of SBF:



156.    In the profile, Sequoia praised SBF and touted the safety of FTX, proclaiming, among other things, that:

> "Of the exchanges that we had met and looked at, some of them had regulatory issues, some of them were already public," [Sequoia partner Michelle] Bailhe says. "And then there was Sam." The exchange that SBF had started to build, FTX, was Goldilocks-perfect. There was no concerted effort to skirt the law, no Zuckerbergian diktat demanding that things be broken. And, yet, FTX wasn't waiting to get permission to innovate. The company had based itself offshore precisely because it aspired to build an advanced risk engine that would support all sorts of hedging strategies. SBF himself seemed to be bred for the role of crypto exchange founder and CEO. Not only had he been a top trader at a top firm—and, thus, the ideal customer—but both his parents were lawyers. "And, so, he is committed to making the right chess moves for FTX to eventually be able to legally

do everything they want to do in the U.S.," Bailhe says—"not by asking forgiveness, but by asking permission."

[. . .]

To be clear, SBF is not talking about maximizing the total value of FTX—he's talking about maximizing the total value of the universe. And his units are not dollars: In a kind of GDP for the universe, his units are the units of a utilitarian. He's maximizing utils, units of happiness. And not just for every living soul, but also every soul—human and animal—that will ever live in the future. Maximizing the total happiness of the future—that's SBF's ultimate goal. FTX is just a means to that end.

[. . .]

After sitting ten feet from him for most of the week, studying him in the human musk of the startup grind and chatting in between beanbag naps, I couldn't shake the feeling that this guy is actually as selfless as he claims to be.

[. . .]

The FTX competitive advantage? Ethical behavior. SBF is a Peter Singer–inspired utilitarian in a sea of Robert Nozick–inspired libertarians. He's an ethical maximalist in an industry that's overwhelmingly populated with ethical minimalists. I'm a Nozick man myself, but I know who I'd rather trust my money with: SBF, hands-down. And if he does end up saving the world as a side effect of being my banker, all the better.

[. . .]

SBF doesn't feel he's doing anything unusual or extraordinary. He's doing what he feels every right-minded person should do—if they were big-hearted and clear-headed. He's attempting to maximize the amount of good in the world.

157.    The profile went on to quote Sequoia partner after partner, each strongly endorsing

SBF and "the scale of his vision" in FTX:

Suddenly, the chat window on Sequoia's side of the Zoom lights up with partners freaking out.

"I LOVE THIS FOUNDER," typed one partner.

"I am a 10 out of 10," pinged another.

"YES!!!" exclaimed a third.

63

[. . . ]

"We were incredibly impressed," Bailhe says. "It was one of those your-hair-is-blown-back type of meetings."

In the profile, Sequoia repeated representations that it could see from its diligence were untrue, including its descriptions of "the advanced risk engine" that FTX claimed to have engineered to protect customer funds, and that:

> Fifty percent of Alameda's profits were going to [effective altruism]-approved charities. . . . The scale of his giving, even now, before he has really started to divest, is massive. Alameda Research, the company that generated the FTX grubstake, still exists, and its purpose seems to be to generate profits—on the order of $100 million a year today, but potentially up to a billion—that can be stuffed into the brand-new FTX Foundation.

158.    Defendants Paradigm and Thoma Bravo provided similar, and much needed, cover for FTX at the time. On September 9, 2022, Paradigm managing partner Matt Huang retweeted the following colloquy with SBF, endorsing SBF's assertion that SBF takes the prevention of financial crime "very seriously:"



Days later, on September 25, 2022, Orlando Bravo, Thoma Bravo's co-founder and managing partner, lauded the legitimacy of FTX, telling the *Financial Times* that:

> I've gotten to know [the crypto] world a little bit more, and some of the business practices don't rise to the level of ethics that we're all used to in private equity with your investors and your customers and your community, and that has been a bit disappointing. . . . However, [Thoma Bravo] would certainly look at putting more money into FTX if it had another funding round.

159.     Sequoia and Thoma Bravo published these statements because they knew that FTX was a teetering house of cards, and one that could bring down the crypto industry with it. Either outcome would harm Defendant VC's bottom line, so Defendant VCs worked to conceal SBF's fraud for as long as they could. These and other assurances by Defendant VCs helped to prolong the life of SBF's scheme, in part by helping to maintain FTX's façade of security, despite crypto's steepening decline at the time.

### e.     *Defendant VCs emerged from the fraud unscathed, while Class Members lost everything.*

160.     Defendant VCs nearly succeeded in cashing out on SBF's fraudulent crypto exchange. However, journalists broke the news of the fraud in early November, and SBF's fraud swiftly imploded. Though many Class Members lost their entire savings to SBF's fraud, Defendant VCs emerged largely unscathed. For example:

- Softbank Defendants reported that, though they marked down their projections of returns from its stake in FTX, FTX's collapse "is very not material for us."

- Sequoia was similarly unphased by the fraud. As Sequoia partner Doug Leone put it, "[l]ike having a child, you forget the pain of having that child three months later, a year later."  Indeed, commentators noted, "[f]rom a portfolio standpoint," FTX's collapse "doesn't matter one bit" for Sequoia.

- Sino Global described the minimal impact of FTX's collapse, explaining that Sino Global "is functioning as normal and continues to invest as a fund," in part because "fund investments have been balanced across ecosystems."

- Multicoin co-found, Kyle Samani, freely acknowledges that "[he doesn't] care about

people who [Multicoin is not] invested in," and Multicoin clearly doesn't care that Class Members now bear the losses that wrought by FTX with Multicoin's assistance.

161.    These comments underscore the win/win scenario that Defendant VCs enjoyed at the expense of Class Members, including Plaintiff O'Keefe.  As long as Defendant VCs could keep SBF's merry-go-round running until FTX went on the selling block or the volatile crypto market returned to ascendancy, Defendant VCs would go down in history as some of the largest rainmakers in the tech industry. Conversely, as they now admit, if the fraud collapsed before FTX reached a sale, Defendant VCs would suffer only non-material losses, losses which Defendant VCs could in fact harvest for hefty tax deductions. All told, Defendant VCs had nothing to lose in propping up SBF's fraud; they instead had everything to gain. And so Defendant VCs assisted the FTX fraud; they did so knowingly; and they did so at Class Members' expense.

**(3)  Fenwick & West**

162.    Defendant Fenwick & West helped set up the shadowy entities through which SBF operated his fraud, structured acquisitions by FTX in ways to circumvent regulatory scrutiny, advised on FTX's regularly dodge, more generally, and supplying personnel necessary to execute on that strategy. As several members of Congress have recently remarked, these and other services are "often central to major financial scandals, given [legal counsel's] role in drafting financial agreements, risk management compliance practices, and corporate controls." Fenwick & West is no different, and the services it provided to FTX were similarly central to SBF's fraud.

163.    For example, Fenwick & West helped to establish and drafted the incorporation papers for North Dimension and its sister company, North Wireless Dimension, the fake electronics retailer that SBF employed as a front to conceal his wiring of Class Member funds into accounts held by Alameda.

164.    Fenwick & West also provided legal and commercial advices on a number of FTX's

business transactions, including FTX Trading's Series B and B-1 capital raises, though the firm has since deleted all announcements regarding the deals, along with any other materials linking the firm to FTX. One transaction of particular note was FTX US's October 2021 acquisition of LedgerX LLC, rebranded as FTX US Derivatives ("LedgerX"), for which Fenwick & West provided legal and commercial counsel. LedgerX was a digital currency futures and options exchange regulated by the CFTC, which had granted licenses to LedgerX to operate as a Designated Contract Market ("DCM"), a Swap Execution Facility ("SEF"), and a Derivatives Clearing Organization ("DCO"). These licenses provided access to U.S. commodities derivatives markets as a regulated exchange, and, with its acquisition of LedgerX, FTX acquired them in one fell swoop. With the help of Fenwick & West, FTX was able to leverage these three licenses in subsequent applications to the CFTC and other regulators.

165.    Zach Dexter, who FTX installed as CEO of LedgerX, touted the acquisition as one that would enhance both FTX's regulatory compliance and the safety of the FTX exchange. Mr. Dexter asserted that these were top priorities for the company in announcing the acquisition:

> As the regulatory environment in the crypto ecosystem continues to evolve, we look forward to acting as a resource and an example of how the protections afforded by proper regulatory oversight and licensing can boost consumer confidence and facilitate safe and reliable exchange platforms. The most important facet of this acquisition of LedgerX is that it allows us to do that. FTX US Derivatives will continue to strive to be a part of the regulation conversation and ensure that the operational standards required by the CFTC are maintained.

At other times, SBF explained that FTX pursued acquisitions like LedgerX, which were purportedly driven by regulatory and compliance considerations, because what matters most "is transparency and protection against fraud."

166.    Contrary to these representations, SBF later admitted to journalists that FTX's public commitment to regulatory compliance was "just PR," to which he added:

fuck regulators

they make everything worse

167.    These admissions highlight FTX's true reasons for acquiring necessary licenses by way of acquisition like LedgerX. Rather than obtain these licenses through application to the licensing agencies, where FTX would face "uncomfortable questions" from regulators, FTX instead purchased other companies that already held the licenses it needed. This allowed FTX to circumvent the scrutiny of regulators like the CFTC, while fostering "the cleanest brand in crypto" and concealing the fraud. This strategy had the added benefit of providing SBF access to meetings and other avenues for lobbying the same regulators he privately denigrated, not to push for heightened customer protections or regulatory oversight, as he claimed publicly, but to lobby for more lenient regulations in the crypto space. Upon information and belief, Fenwick & West helped to design FTX's licensing by acquisition strategy in furtherance of SBF's fraud.

168.    Fenwick & West assisted FTX's regulatory dodge more broadly, too. In a filing with the CFTC, FTX US disclosed that "FTX US monitors both Federal and State level development with its outside legal counsel, Fenwick & West LLP. FTX US has worked closely with Fenwick & West LLP on the development of its BSA program, as well as documentation and compliance assessments." Upon information and belief, Fenwick & West helped FTX to develop "compliance" procedures designed to skirt FTX's regulatory obligations or conceal its noncompliance therewith.

169.    Fenwick & West also supplied a pipeline of key personnel to FTX necessary to executing the fraud. Both FTX's chief regulatory officer, Dan Freidberg, and its general counsel, Can Sun, joined FTX from Fenwick & West, where they worked for years as partners of the firm.

While working as FTX's top compliance officer, Mr. Friedberg also served as legal counsel for Alameda. Both Mr. Friedberg and Mr. Sun were key to concealing SBF's fraud from public view and worked closely with their former law firm in doing so. For example, with the Fenwick & West's assistance, Mr. Friedberg and his team manufactured "squeaky clean . . . trove[s] of information" on FTX's operations, audits and regulatory licenses disclosed to the press and other outlets.

170.   Mr. Friedberg is not without a checkered past, of which Fenwick & West surely knew. For example, in 2008, he was linked to a cheating scandal involving the online poker site Ultimate Bet. For years, Ultimate Bet allowed certain players to employ "God-mode," which allowed them to see the hands held by their unsuspecting competitors. Victims of the scandal lost an estimated $40 million to cheating players. At the time, Mr. Friedberg was an executive at the software company that managed Ultimate Bet. Rather than report the scandal to the public, Mr. Friedberg sought to cover it up, suggesting that Ultimate Bet tell the public that an outside consultant "took advantage of a server flaw by hacking into the client," and that Ultimate Bet was "unable to identify exactly when" the hacking occurred. News broke of Mr. Friedberg's attempts to suppress the truth about the scandal in 2013, one year before he joined Fenwick & West.

171.   Fenwick & West provided this assistance despite its knowledge that SBF was misappropriating Class Member funds. The provision of each of the services required due diligence, including, for example, reviewing the organizational documents for each FTX entity, including certificates of incorporation or formation, by-laws and other agreements, and understanding the purpose of business entities formed (e.g., North Dimension); reviewing customer contracts, including the FTX US terms of service referenced herein, and reviewing finance documents including intracompany loans or other related party agreements, guarantees and

promissory notes. In providing these services to FTX, and from its close ties with Mr. Friedberg and Mr. Sun, Fenwick & West learned that SBF and his affiliates were misappropriating Class Member funds including by way of the omissions set forth in Paragraph 58. Yet, motived by the substantial fees it would enjoy in return, Fenwick & West aided SBF's fraud anyway, including by way of the overt acts described herein.

### (4) Defendant Accounting Firms

172.    Defendant Accounting Firms audited the key FTX entities and certified that the companies had satisfactory internal controls in place to protect Class Member funds, despite knowing full well that such controls were not in place. In doing so, Defendant Accountant Firms helped to conceal that FTX was littered with weak, if not absent, internal controls, which prolonged the fraud and expanded its reach.

173.    Specifically, Preger Metis and Armanino audited, and then signed off on, FTX Trading's and FTX US's 2020 and 2021 financial statements, respectively. These audits provided FTX with a necessary veneer of stability and safety and helped to conceal SBF's fraud.

174.    Both Preger Metis and Armanino are registered with the Public Company Accounting Oversight Board ("PCAOB"), and, though required only to follow PCAOB standards when auditing public issuers or broker dealers, Preger Metis and Armanino are familiar with those standards as best industry practices and, upon information and belief, employed them in auditing FTX. To be sure, Defendant Accounting Firms knew of, and employed in their audits of FTX, the standards set by the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA"), which apply to audits of non-public issuers and other non-reporting companies.

175.    Generally, the standards set by both the PCAOB and ASB require that the auditor have sufficient training and proficiency, maintain independence from the company being audited,

and adhere to industry standards of care in carrying out the audit. These standards further require that the auditor gain a sufficient understanding of the company under audit and gather sufficient evidence to assess the company's financial statements by, for example:

- Physically examining the company's inventory or visiting its facilities;

- Reviewing the company's accounting records;

- Interviewing, both formally and informally, company employees about their activities, or observing their regular activities;

- Interviewing, both formally and informally, business counterparties about their dealings with the company; and

- Evaluating the assumptions and choices of accounting principles made by management in preparing the company's financial statements.

176.     From this, Defendant Accounting Firms acquired knowledge of FTX's operations and financial statements, and could see that FTX was misappropriating Class Member funds including by way of the omissions set forth in Paragraph 58. Still, Defendant Accounting Firms provided FTX a clean bill of health, opining that its financials were fairly presented and identifying no issues with its accounting practices or internal controls. SBF repeatedly capitalized on the credibility lent to FTX by way of these audits, tweeting, for example,  in July 2021, that, "FTX became the first (?) crypto derivatives exchange to complete a GAAP audit!" and, in August 2021, "Both [FTX Trading] and [FTX US] have passed US GAAP audits and plan to continue getting audits going forward." Defendant Accounting Firms' misreporting of FTX's true condition allowed FTX to represent to its customers that its accounting practices were sound, and that it had appropriate internal controls in place, both necessary to FTX's fraud.

177.     Defendant Accounting Firms' misconduct is not all that surprising. Preger Metis and Armanino share a reputation for misreporting their audit findings in violation of applicable standards. For example, in 2021, Armanino conducted an audit of Lottery.com, a publicly traded

online lottery broker, and issued an unqualified audit opinion that the company's financial statements were correct in all material respects, and that Armanino had no disagreements with Lottery.com's accounting principles and practices. In issuing the opinion, Armanino helped conceal that, in those financial statements, Lottery.com "overstated its available unrestricted cash balance by approximately $30 million," and had "improperly recognized revenue in the same amount." Among other "issues pertaining to [Lottery.com's] internal accounting controls," Armanino further helped to conceal a $20 million line of credit taken out by a subsidiary and omitted from Lottery.com's financial statements. Armanino's history is riddled with similar instances of misconduct summarized in a 2018 inspection by the PCAOB of Armanino, through which the PCAOB uncovered similar defects. Preger Metis is no different. According to a public report by the PCAOB dated May 13, 2020, Preger Metis failed all four of its most recent inspections by the PCAOB, which identified deficiencies and other instances of non-compliance with PCAOB rules.

178.    Moreover, and contrary to the PCAOB and ABS standards for independence, both Preger Metis and Armanino publicly praised SBF while providing auditing services to FTX, helping to solidify the crypto exchange's reputation for transparency, safety, and its implementation of appropriate internal controls. For example, when SBF "gave evidence to a congressional committee in December [2021], Armanino tweeted "Next up . . . [SBF.] Let's go buddy!"

179.    In short, from their diligence and adherence to industry standards, Defendant Accounting Firms knew that FTX was misappropriating those funds. Yet they provided assistance to FTX in the form of sham audits and public endorsements, in furtherance of FTX's façade of trustworthiness, legitimacy, and stability, without which SBF's fraud could not have succeeded.

## CLASS ACTION ALLEGATIONS

180.    Plaintiff O'Keefe brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

> All natural persons and entities who purchased, deposited and/or transacted Class Member funds in accounts on the FTX platform any time after May 1, 2019, through FTX's collapse on November 11, 2022, the date on which it filed for bankruptcy, and have been harmed by Defendants' conduct alleged herein.

181.    **Numerosity and Ascertainability**. Members of the Class are so numerous that joinder is impracticable. Plaintiff O'Keefe does not know the exact size of the Class but believes that there as many as 2.7 million class members in the United States alone. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically. Membership in the class may be ascertained through records held by Class Members, for example, their own bank records, and/or records held by FTX.

182.    **Typicality**. Plaintiff O'Keefe's claims are typical of the claims of the members of the Class. Plaintiff O'Keefe and all members of the Class were damaged by the same wrongful conduct of Defendants.

183.    Plaintiff O'Keefe will fairly and adequately protect and represent the interests of the Class. Plaintiff O'Keefe's interests are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving his own claims, Plaintiff O'Keefe will prove other Class members' claims as well.

184.    **Adequacy of Representation**. Plaintiff O'Keefe is represented by counsel who are experienced and competent in the prosecution of complex securities litigation on behalf of investors, including suits against third party aider/abettors to financial fraud. Plaintiff O'Keefe and his counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff O'Keefe can and will fairly and adequately represent the interests of the Class and

have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

185.    **Commonality and Predominance**. There are questions of law and fact common to the Class that predominate over any questions of law or fact affecting the claims of individual Class Members, including, but not limited to:

- Whether FTX's YBA program was a fraudulent enterprise;

- Whether FTX used material misstatements of fact or omissions to induce Class Members to deposit funds into accounts on the FTX exchange.

- Whether FTX and/or SBF breached a fiduciary duty to Class Members.

- Whether FTX and/or SBF converted Class Member funds.

- Whether the respective Defendants knew about or possessed a general awareness of wrongdoing by FTX and/or SBF;

- Whether Defendants' respective actions substantially assisted the wrongdoing of FTX and/or SBF;

- Whether Defendants conspired with FTX and/or SBF;

- Whether Defendants took overt acts in furtherance of that conspiracy; and

- Whether the Class has been damaged by the alleged wrongful conduct of Defendants.

186.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, as Class Members are dispersed across the United States. Moreover, the claims of many Class Members does not exceed the cost of litigating the claims individually, and individual suits would not be cost effective or economically viable as individual actions.

<u>**CAUSES OF ACTION**</u>

**A.  Count One: Civil Conspiracy (All Defendants)**

187.    Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 186 as if fully set forth herein.

188.     There was an express or implied agreement between at least one of SBF and/or other agents of FTX and each of the Defendants to deceive Class Members, and to commit the wrongful conduct described herein, including FTX's fraud, breach of fiduciary duty to Class Members, and conversion of Class Members property.

### (1)      Defendant Banks

189.     Through the course of their due diligence and ongoing monitoring, and in providing high-risk, non-routine banking services to FTX and its founder, SBF, Defendant Banks acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, each Defendant stood to gain financially from FTX's misconduct, and each Defendant Bank agreed, at least impliedly, to assist that unlawful conduct.

190.     Defendant Banks agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including:  (1) accepting deposits of Class Member funds into accounts held by Alameda or other entities that SBF separately owned, notwithstanding knowledge that the funds belonged to Class Members; (2) transferring Class Member funds from accounts held by FTX first into stopover accounts held by Alameda, and then to SBF, his friends, and his family members, often labeled as large hundred-million dollar "loans;" (3) providing FTX and its affiliates access to the U.S. banking system, a service that other U.S. banks refused to provide; and (3) supplying other infrastructure critical to SBF's fraud—and unique to Defendant Banks—including the SEN and Signet proprietary platforms.

### (2)      Defendant VCs

191.     Through the course of their due diligence and hands-on partnerships with FTX, and in providing guidance to FTX and its founder, SBF, Defendant VCs acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this

knowledge, each Defendant stood to gain financially from FTX's misconduct, and each Defendant VC agreed, at least impliedly, to assist that unlawful conduct.

192.    Defendant VCs agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) propping up SBF's fraud—and expanding its reach—by injecting more than $2 billion of necessary capital into the scheme; (2) generating for FTX the appearance of legitimate operations, strong financial condition, and other credibility, which permitted the scheme to grow in scale and persist in duration; (3) advising FTX on ways to continue its growth, thereby attracting new victims and thrusting the scheme forward; and (4) concealing the fraud when the cryptocurrency industry began to falter, with the purpose of keeping the fraud afloat until Defendant VCs could cash out in a public or private sale or once the crypto market recovered.

### (3)    Fenwick & West

193.    Through the course of its due diligence, long and close relationship with, and ongoing services to FTX, Fenwick & West acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, Fenwick & West stood to gain financially from FTX's misconduct and agreed, at least impliedly, to assist that unlawful conduct.

194.    Fenwick & West agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) forming shell entities, including North Dimension and North Wireless Dimension, through which FTX siphoned Class Members funds; (2) structuring acquisitions and other transactions by which FTX expanded its product offerings—and, by extension, its reach to victims—and through which FTX dodged

regulatory scrutiny to obtain necessary licenses; and (3) generating for FTX the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

**(4)      Defendant Accounting Firms**

195.     Through the course of their due diligence in compliance with PCAOB, ASB, and/or industry standards, Defendant Accountants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Members' funds. Despite this knowledge, Fenwick & West stood to gain financially from FTX's misconduct and agreed, at least impliedly, to assist that unlawful conduct.

196.     Fenwick & West agreed, at least impliedly, with SBF and/or one or more of his co-conspirators to commit the overt acts alleged herein, each in furtherance of SBF's fraud, breach of fiduciary duty, and conversion of Class Members' property, including (1) forming shell entities, including North Dimension and North Wireless Dimension, through which FTX siphoned Class Members funds; (2) structuring acquisitions and other transactions by which FTX expanded its product offerings—and, by extension, its reach to victims—and through which FTX dodged regulatory scrutiny to obtain necessary licenses; and (3) generating for FTX the appearance of legitimate operations, strict adherence to regulatory obligations, and esteem for legal compliance, which permitted the scheme to grow in scale and persist in duration.

197.     But for the overt acts taken by Defendants and other members of the conspiracy to further the objectives of the FTX fraud described herein, SBF and his co-conspirators would not have been able to carry out the FTX Fraud. Plaintiff O'Keefe and Class Members have suffered particularized harms from the foregoing conspiracies to commit fraud, breach of fiduciary duty, and conversion.

**B. Count Two: Common Law Aiding and Abetting Fraud (All Defendants)**

198.    Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 186 as if fully set forth herein.

199.    FTX, and its founder SBF, defrauded Class Members by, among other things, making the following material omissions in soliciting their deposits:

- FTX was not segregating Class Member funds, instead commingling those funds in FTX's omnibus accounts and treating those funds as FTX's own;

- SBF was siphoning Class Member funds to his friends and family members or for his own personal use;

- FTX and Alameda were not, in fact, "wholly separate entities at arm's length," and were instead operated as a common enterprise;

- FTX directed that Class Member funds be wired directly into accounts held by Northern Dimension, a subsidiary of Alameda;

- SBF was looting Class Member funds under the guise of non-arm's length "related party transactions" and "loans" often by way of Alameda;

- SBF routinely transferred Class Member funds out of accounts held by FTX to those held by Alameda;

- SBF was using Class Member funds to underwrite his speculative personal investments at Alameda;

- Alameda was exempt from the "risk engine" and other FTX protocols in place to prevent a user from becoming undercollateralized or overleveraged on the exchange;

- With the foregoing exemption, Alameda engaged in margin trading on the FTX platform, exposing Class Members to the risk of Alameda's loss;

- FTX used Class Member funds to manipulate the price of FTT, which was not "widely distributed," but instead concentrated in the hands of FTX and Alameda; and

- FTX did not have in place fundamental internal controls, including an independent board of director or a CFO.

200.    Based on their knowledge of the financial industry, with a focus on serving crypto

clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants acquired knowledge of FTX's omissions and untruthful conduct and misappropriation of Class Member funds.

201. Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

202. Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for aiding and abetting his fraudulent scheme.

**C. Count Three: Common Law Aiding and Abetting Fiduciary Breach (All Defendants)**

203. Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 186 as if fully set forth herein.

204. FTX took custody of the Class Member funds. As alleged herein, FTX promised Class Members funds were safe in its hands, and that FTX customer funds were "held by FTX for [their] benefit." As a custodian of Class Member funds, and by virtue of the promises FTX made to safeguard their funds, FTX owed a fiduciary duty to Class Members, and FTX was obligated to discharge that duty in good faith, with the care that a fiduciary in a similar position would exercise and in a manner reasonably believed to be in the best financial interests of Class Members.

205. Rather than safeguarding Class Member funds, FTX misappropriated their funds in breach of the fiduciary duty owed to Class Members. These breaches include, but are not limited to: (1) transferring funds belonging to Class Members to Alameda and other of SBF's separately owned entities; (2) transferring funds belonging to Class Members to SBF and his co-conspirators; (3) using funds belonging to Class Members to engage in self-dealing, including non-arms' length

transactions among SBF's affiliated entities.

206.   Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants had Defendants acquired knowledge of FTX's fiduciary duty to Class Members and breaches thereof.

207.   Notwithstanding this knowledge, and by reason of the conduct described above, Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in a fraudulent scheme against Class Members, including by the actions set forth above.

208.   Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for participating in the breach of FTX's fiduciary duty.

**D.  Count Four: Aiding and Abetting Conversion (All Defendants)**

209.   Plaintiff O'Keefe hereby incorporates the allegations in Paragraphs 1 through 186 as if fully set forth herein.

210.   The funds deposited by Class Members into YBAs on the FTX exchange were personal property of Class Members. SBF and his co-conspirators wrongfully exercised dominion or control over such property, misappropriating Class Member funds entrusted to FTX.

211.   Based on their knowledge of the financial industry, with a focus on serving crypto clients, and their understanding of FTX's operations obtained through diligence, ongoing monitoring and/or hands-on partnership, Defendants had Defendants acquired knowledge of FTX's conversion of Class Member funds.

212.   Notwithstanding this knowledge, and by reason of the conduct described above,

Defendants substantially aided, abetted, and/or participated with SBF and his co-conspirators in conversion of funds belonging to Class Members, including by the actions set forth above.

213.    Defendants' actions, in combination with the actions of SBF and his co-conspirators, are a proximate cause of actual damages to Class Members. As a result of this conduct, Defendants are jointly and severally liable for participating in the breach of FTX's conversion of Class Member funds.

## JURY DEMAND

214.    Plaintiff O'Keefe demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of himself and those similarly situated, Plaintiff O'Keefe prays for judgment in its favor and against Defendants for compensatory damages, punitive damages, attorney's fees, and for all such other relief as this Court deems fair and just.

Dated: February 22, 2023                Respectfully submitted,

*/s/ Timothy A. Kolaya*
Timothy A. Kolaya, Fla. Bar No. 056140
Jorge A. Pérez Santiago, Fla. Bar No. 91915
Amy M. Bowers, Fla. Bar No. 105755
STUMPHAUZER KOLAYA
NADLER & SLOMAN, PLLC
2 South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
T: (305) 614-1400; F: (305) 614-1425
tkolaya@sknlaw.com
jperezsantiago@sknlaw.com
abowers@sknlaw.com

James R. Swanson, La. Bar. No. 18455
*(Motion to Appear Pro Hac Vice to be Filed)*
Kerry J. Miller, La. Bar. No. 24562
*(Motion to Appear Pro Hac Vice to be Filed)*
Benjamin D. Reichard, La. Bar No. 31933
*(Motion to Appear Pro Hac Vice to be Filed)*
C. Hogan Paschal, La. Bar No. 38495
*(Motion to Appear Pro Hac Vice to be Filed)*
Monica Bergeron, La. Bar No. 39124
*(Motion to Appear Pro Hac Vice to be Filed)*
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
(504) 586-5252; (504) 586-5250 fax
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
breichard@fishmanhaygood.com
hpaschal@fishmanhaygood.com
mbergeron@fishmanhaygood.com

**Counsel to Plaintiff O'Keefe and the Putative Class**